**SANUS/NEW YORK LIFE HEALTH PLAN, INC. f/k/a Maxicare Texas, Inc., Appellant,**

v.

**DUBE–SEYBOLD–SUTHERLAND MANAGEMENT, INC., a Texas Corporation, and Dube–Seybold–Sutherland Leasing, a Texas General Partnership, Appellees.**

No. 01–91–00282–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 23, 1992.
Rehearing Denied Aug. 20, 1992.

Neal S. Manne, William H. White, F. Eric Fryar, Houston, for appellant.

Rhett G. Campbell, David A. Furlow, Houston, for appellee.

Before DUNN, PRICE * and DUGGAN, JJ.

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

## OPINION

DUGGAN, Justice.

This is a suit involving a health maintenance organization's failure to pay fees claimed by a dental care provider under a contract.[1]

**The Parties.**

Maxicare, Texas ("Maxicare") was an HMO offering group health care plans to Texas employers. Appellant, Sanus/New York Life Health, Inc. ("Sanus"), purchased Maxicare November 1, 1988. Dube–Seybold–Sutherland Management, Inc. ("DSS Management" or "DSS") is a professional dental corporation through which Doctors Kayron Dube, Susan Seybold, and Charles Sutherland practiced dentistry from 1985 through 1989. DSS Management and Dube–Seybold–Sutherland Leasing ("DSS Leasing"), a Texas general partnership, are appellees and cross-appellants. Dube–Seybold–Sutherland Service ("DSS Service"), a related corporation, received an assignment of one of DSS Management's contract claims against Maxicare. That claim was resolved by separate suit, and DSS Service is not a party here.

**The Contract.**

On June 10, 1985, DSS entered into a contract with Maxicare denominated "Dental Provider Agreement for Private Pro-grams." Under the terms of the contract, which was prepared by Maxicare, DDS Management agreed to provide dental services to eligible HMO "members."[2] (Dental coverage was not automatic for all Maxicare HMO members, but was available for an additional premium.) Maxicare contracted to (1) maintain eligibility lists that would enable DSS to identify members eligible for dental care,[3] (2) timely provide DSS with the names of all eligible members, and (3) pay DSS for its dental care services on a monthly basis. The monthly payment or "capitation fee" to be paid to DSS was to be calculated on an adjusted head count of HMO members assigned to DSS's care.[4] DSS Management's lawsuit was based on its contention that Maxicare did not pay it the capitation required by the contract for its participation in the HMO system.

Because they are virtually the only source of payment for services rendered, capitation payments are crucial to an HMO provider's profitability. Typically, only approximately 10 percent of eligible members actually seek dental care and these patients pay either nothing or a small co-payment for treatment.[5] Therefore, to pay its fixed costs, that is, salaries and overhead, and make any profit, the provider must rely on the capitation payments, not only for the one of ten who seeks care but also for the

---

1. A health maintenance organization (HMO) sells group coverage medical insurance (including dental insurance) to "subscribing groups." Employees of those groups become "subscribers" by paying monthly premiums for themselves and, in some cases, their dependents. The HMO provides prepaid medical and dental care by contracting with health care service "providers." The HMO pays the provider a monthly fee ("capitation fee") from the monthly premiums paid by the subscribers and the members obtain health care services free or for a small "co-payment."

2. The term "member" includes the HMO "subscriber," that is, the enrolled person (employee) who pays the monthly premium, and his or her spouse and dependents, if any. All members are entitled to receive treatment on the same basis as the subscriber.

3. An "eligibility report" contains an alphabetical list of all subscribers and dependents by name. Eligibility reports were supposed to be updated weekly. DSS relied heavily on these reports in determining who was entitled to treatment. On the other hand, a "capitation report" lists subscribers with the number but not the names of their dependents. Capitation reports were compiled on the 20th of each month. Capitation reports are a management tool used for calculation of capitation payments to the provider.

4. The contract obligated Maxicare to pay a monthly capitation fee to DSS based on the number of subscribers and the size of their families. Specifically, the contract provided three rates of capitation: one rate for a single employee, one for an "employee plus one," and a third rate for an employee with two or more dependents. The capitation fee is based on the number of members *eligible* to receive services, not the number who actually visit the dentist.

5. Note the crucial distinction between "members" and "patients." During the 1985–1989 period, approximately 10 to 13 percent of Maxicare's eligible members sought dental care and thus became patients.

other nine who do not. In order to determine who was eligible for dental services and what amount of capitation was to be paid, DSS required accurate eligibility and capitation reports.

How the Maxicare system worked or failed to work.

An employee who enrolled in the Maxicare plan first filled out an enrollment card, and, if eligible for dental care, selected a primary dental care provider. The employer then transmitted the membership information and premiums to Maxicare. Employees selecting DSS would be placed on DSS's eligibility and capitation lists as eligible members. Changes in membership, such as the addition or termination of members, were also transmitted to Maxicare by the employer.

Under the contract, a prospective patient would request a dental appointment with DSS. A DSS employee would check the patient's eligibility by consulting a computerized database maintained by Kelsey–Seybold Clinic.[6] Kelsey–Seybold, in turn, obtained its information regarding eligibility from computer-generated data provided by Maxicare Health Systems, Inc. of California ("Maxicare California"). Maxicare California compiled the data from enrollment cards sent to it from Houston and forwarded the information to Kelsey–Seybold via computer tapes each week.

Because DSS had no independent means of verifying the information thus provided, it had to rely completely on Maxicare to determine eligible members and capitation payments. Without accurate information from Maxicare, DSS could not determine who to treat or how much capitation it was owed. More importantly, without accurate eligibility data, DSS would not even realize if it were being underpaid. This forced reliance on information exclusively in Maxicare's control, an imbalance of bargaining power, and the implicit trust in which that reliance was based, were the bases for DSS's claim and the trial court's finding that a special relationship existed between the entities. Based on the existence of this special relationship, the trial court found that Maxicare had a duty to provide DSS with accurate and timely eligibility and capitation data and owed DSS a duty of good faith and fair dealing.

At trial, Maxicare did not claim to have provided DSS with accurate or timely information. Instead, Maxicare took the position that the limitations of the system it used for maintaining the eligibility and capitation data necessarily resulted in inevitable time lags, of 30 days to six months, between effective dates of coverage, employers' reporting of new applications and terminations, and Maxicare's processing of the data. As a result of these "unavoidable time lags," individuals would present themselves for treatment before their names appeared on the eligibility list and others would obtain treatment after their coverage had been terminated but before their names were removed from the list. Maxicare contended that DSS knew that the information was "very dynamic" and effectively accepted these limitations through the parties' course of dealing.

DSS attributed the chaotic state of Maxicare's information systems to its extremely rapid national growth during the period 1982 to 1988, when it added 40 different providers nationwide. To manage the information, Maxicare turned to a subsidiary, HCS Computer, Inc., which devised a series of at least 18 data processing program "evolutions." Although it was required by contract to provide DSS with accurate monthly eligibility lists, as a result of continual, haphazard changes in the computer programs, Maxicare never provided DSS with up-to-date eligibility information.

In an effort to deal with the confusion created by the time lags, Maxicare began a practice of "retro-additions" and "retro-deletions." Under this system, when an unlisted person claiming eligibility presented for treatment, Maxicare issued that person a temporary eligibility number. Once the temporary number was assigned, DSS was authorized and obligated to treat the individual. Maxicare was supposed to pay cap-

6. Kelsey–Seybold is a Houston medical clinic that provided administrative services to DSS. It is not related to any of the parties and has no stake in this litigation.

titation for that individual retroactive to the date of his or her original enrollment.

According to DSS, Maxicare represented that it was keeping track of these "unlisted members" for payment of the capitation. However, Maxicare took the position that the temporary numbers were only necessary to give assurance to DSS that the person involved was eligible for treatment. Maxicare did not use the temporary numbers to see that new members got on the eligibility list. In addition, Maxicare did not keep track of the numbers and, when asked by DSS, could not account for the temporary numbers that had been assigned. There was no system for checking to see whether proper capitation was ever paid for those patients who were assigned temporary numbers.[7]

Based on an established utilization rate of 10 to 13 percent, the trial court found that the temporary numbering system identified only the one unlisted patient who sought dental care, not the nine unknown HMO members who did not seek care. Maxicare had no method for checking to see whether capitation was ever paid for those nine unlisted members. Likewise, DSS was unable to determine the full extent of Maxicare's underpayment.

The First Lawsuit.

In December 1988, DSS Management assigned to DSS Service its right to reimbursement from Maxicare on a "fee for service" basis for dental services provided to unlisted and ineligible patients. Those were the patients who were designated eligible for services, either by inclusion on the computer list or by issuance of a temporary number, but were not eligible. (See categories two and three in footnote seven.) DSS Service sued Maxicare for that payment seeking to offset the amounts it claimed were owed to it against amounts it owed to Maxicare on a note for equipment executed by DSS Service in 1985. The suit

ended in settlement in January 1989. The trial court found that the settlement released Maxicare from any claim of *fee for service* for patients treated by DSS who were not eligible members of the plan. The suit did not involve Maxicare's failure to pay *capitation* for unlisted eligible members.

The Second Lawsuit and Maxicare's Counterclaim.

DSS Management filed the second lawsuit in July, 1989.[8] Maxicare counterclaimed, seeking to collect on the balances on two notes executed in its favor by DSS. The first note was executed in June 1985 for the purpose of acquiring capital equipment, inventory, and working capital. The full recourse portion of the note had been satisfied, but a balance remained on a portion of the note that was non-recourse or recourse to equipment only. That portion of the note was the subject of Maxicare's counterclaim. A second note was executed in January 1986 for the purpose of opening an office in Pasadena. This note was with recourse to the equipment and to the corporation, DSS Management. The trial court's rulings regarding these notes, which were favorable to Maxicare, are not the subject of this appeal.

Maxicare states that the second lawsuit, which gives rise to this appeal, is about the *patients* in category four: those patients who were not on the eligibility lists, who were assigned a temporary number and treated, and were later found to be eligible. However, this characterization is not completely accurate. While DSS did complain about the "lag time" during which it was not paid capitation for these eligible *patients,* of far more serious concern were the "other nine," those eligible *members* who never presented for treatment (thus, never became *patients,* see footnote 5) and about whom DSS could not have known. Because the information on *patient* eligibil-

---

7. Maxicare characterizes the situation as involving four categories of patients: (1) those who were on the eligibility list and were eligible, (2) those who were on the eligibility list and were not eligible, (3) those who were not on the list, were issued a temporary number, and were later found to be ineligible, and (4) those who were not on the list, were assigned a temporary number, and were later found to be eligible.

8. Although Sanus had purchased Maxicare by that time, we will continue to refer to the defendant as Maxicare, as do the parties.

ity was proven to be inaccurate, the calculation of capitation based on eligibility of *members* had to be inaccurate also. DSS had no way to identify the 90 percent of unlisted eligible members for whom capitation was owed.

To determine how much capitation was unpaid, DSS obtained a list of all Maxicare members assigned to DSS for each month from July 1985 forward.[9] Presumably, this list, having been compiled in early 1989, did not suffer from the time lag inaccuracies of earlier lists. Using an average capitation rate of $5.77 per eligible member per month, Dr. Dube then calculated the amount of capitation that should have been paid to DSS and determined that DSS had been substantially underpaid. She requested that Maxicare provide an explanation of the discrepancies indicated by her calculations. DSS filed suit when Maxicare failed to respond to this request.

The Trial Court's Judgment.

Following a nonjury trial, the trial judge found that Maxicare was liable for breach of contract, violation of a special relationship, breach of the duty of good faith and fair dealing, and negligent misrepresentation, and awarded DSS $234,252 in actual damages and $100,000 in exemplary damages. It later ordered a remittitur in the amount of $78,084. Maxicare raises six points of error complaining of the trial court's findings of liability and damages. DSS raises five cross-points of error asserting error in the amount of the trial court's damage award and its finding that DSS was not a consumer under the Deceptive Trade Practices Act.

DSS Management's injury and the affirmative defense of settlement and release.

In its first point of error, Maxicare contends that the trial judge erred in entering judgment for DSS Management because there was no evidence of any actionable injury to DSS Management. In a closely related second point, Maxicare contends that the settlement and release executed by the parties in the first lawsuit barred the

second suit against Maxicare as a matter of law.

As previously noted, the first suit was filed by DSS Service on claims assigned to it by DSS Management. The suit complained specifically about Maxicare's failure to pay fee-for-service for the patients who were treated by DSS under temporary identification numbers and later found to be ineligible for services. In the second suit, the trial court found that DSS Management was not a party to the first suit. However, DSS Management did join in the settlement that ultimately disposed of that suit. Maxicare believes that, because DSS Management executed the settlement and release, it was barred from seeking payment in the second suit as a matter of law.

■■■ In construing a release, the general rules relating to the construction of contracts apply. *Mutual Fire and Auto. Ins. Co. v. Green*, 235 S.W.2d 739, 742 (Tex.Civ.App.—Fort Worth 1950, writ denied). The court will ascertain and give effect to the intention of the parties as of the time of execution of the release. *Berry v. Guyer*, 482 S.W.2d 719 (Tex.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.). The release will be considered as a whole and read in the light of the surrounding circumstances, *including related documents*. *Crawford v. Kelly Field Nat. Bank*, 733 S.W.2d 624, 627 (Tex.App.—San Antonio 1987, no writ) (in light of the circumstances); *Loy v. Kuykendall*, 347 S.W.2d 726, 728 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.) (considered as a whole); *Green*, 235 S.W.2d at 742 (related documents) (emphasis added).

■■■ Here, insofar as the settlement and release might apply to bar DSS Management's later claims, its meaning and intent must be determined by an analysis of the related assignment. Although the settlement and release contains broad language in referring to the assignment, we must look to the actual terms of the assignment itself in determining which rights

---

9. The parties refer to this list as the "Burns Report" because it was compiled by Robert Burns, Kelsey–Seybold's data processing manager who had previously entered the Maxicare computer tapes into the Kelsey–Seybold database.

were actually transferred from DSS Management to DSS Service and disposed of by settlement. A court must construe general, categorical release clauses narrowly. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex.1984). Any claims not clearly within the subject matter of a release are not discharged, even if such claims existed at the time the release was executed. *Vela v. Pennzoil Prod. Co.*, 723 S.W.2d 199, 204 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.).

■ Paragraph two of the settlement and release states that "DSS Management has assigned its right and obligation to provide *such* services and to receive capitation payments therefrom to DSS Service pursuant to an assignment effective as of June 10, 1985." Relying on this language, appellant insists that, pursuant to the assignment, DSS Management assigned *all* its rights and duties under the contract with Maxicare (the dental provider agreement) to DSS Service, thus leaving it no right of its own on which to base a claim for· payment.

Appellant's argument ignores the clear language of the assignment, however, which assigns to DSS Service the right to payment "for services rendered to patients at the specific request of Maxicare [10] which patients were, for various reasons, ineligible to participate in Maxicare's health maintenance organization and were therefore ineligible for treatment ... and for which Maxicare is indebted to DSS Management for the fair market value and contract value of services rendered...." In other words, the assignment covered only the right to payment for unlisted and ineligible persons who were actually treated by DSS. The exhibits attached to the assignment confirm that the assignment covered only DSS's claims for payment of fee-for-service.

Appellant also ignores paragraph three of the settlement itself. Paragraph three limits the operation of the settlement to patients to whom "services were provided ... at the specific instance and request of Maxicare" and who were "ineligible to participate ... and were therefore ineligible for treatment." In other words, unlisted and ineligible persons who were actually treated by DSS.

Viewing the settlement as a whole and considering the related assignment, it is clear that the trial judge was correct in his determination that the subject matter of both documents related only to the right to payment of *fees for services* rendered to those patients who were assigned temporary numbers by Maxicare and were provided treatment by DSS, but were, in fact, *ineligible* to participate in Maxicare's health maintenance organization. The instant case asserts claims for *capitiation payments* on unlisted *eligible members*, not *ineligible patients*. Therefore, because DSS Management was not a party to the first suit and made no assignment of the claims brought in the instant case, it could not have settled or released those claims. The trial court correctly concluded that DSS Management was entitled to sue Maxicare for payment of capitation for unlisted eligible members.

Finally, Maxicare argues that the claims brought in the instant suit could have been brought in the first suit and are therefore covered by the language in the settlement that releases Maxicare from "any and all ... liabilities, claims, or causes of action alleged in, or that could have been alleged in, the suit filed under Cause No. 88-062733...." This is incorrect. DSS Management was not a party to the first suit. DSS Service brought that suit on the only cause of action that belonged to it by virtue of the assignment. It could not have asserted DSS Management's remaining claims.

We overrule Maxicare's first and second points of error.

The Contract Issues.

In its third and fourth points of error, Maxicare contends that the trial court's

**10.** Maxicare made the "specific request" by issuing temporary identification numbers to these persons.

interpretation of the contract was incorrect as a matter of law and that the evidence was legally and factually insufficient to support a conclusion that Maxicare breached the contract by underpaying DSS. Further, according to Maxicare, even if there were a breach, it was not material and did not cause damages to DSS.

Maxicare contends that the trial court erred in holding (1) that DSS Management was contractually entitled to timely receive accurate monthly capitation and eligibility reports and (2) that Maxicare breached the contract by failing to provide those reports. Although Maxicare claims the holding is wrong "as a matter of contract interpretation," it fails to specify the precise errors in interpretation allegedly made by the trial court. The contract required Maxicare to maintain records and establish procedures that would enable DSS to identify members entitled to receive services from the dental provider. Capitation was paid from calculations based on the eligibility lists. The trial court concluded that inherent in this contractual obligation was the obligation to maintain *complete* and *accurate* information and supply it to DSS in a *timely* manner. We find no error in this interpretation.

We review the sufficiency of the evidence to support a trial court's findings of fact and conclusions of law under the same standard as that applied to a jury's verdict. *McGahey v. Ford*, 563 S.W.2d 857, 862 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.). In determining whether there is legally sufficient evidence to support the findings, we give credence only to the evidence and inferences favorable to the findings and disregard all evidence to the contrary. *Brown v. Frontier Theaters, Inc.*, 369 S.W.2d 299, 301 (Tex.1963); *IFG Leasing Co. v. Ellis*, 748 S.W.2d 564, 566 (Tex.App.—Houston [14th Dist.] 1988, no writ). If there is any evidence of probative force to support the finding, we must uphold it. *Ray v. Farmers' State Bank*, 576 S.W.2d 607, 609 (Tex.1979). In reviewing factual sufficiency, we consider all the evidence both in support of and contrary to the finding. We will uphold the finding

unless we find it to be so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *IFG Leasing*, 748 S.W.2d at 565–566.

The trial court concluded that Maxicare breached the contract (1) by its failure to maintain the relevant records in a complete and orderly fashion and (2) by its failure to pay DSS the capitation that was due. This breach was the cause of damages to DSS in the amount of $234,252. The court also concluded that Maxicare was not entitled to escape payment of damages because of its own wrongful conduct in this regard, which made the precise ascertainment of damages more difficult.

Maxicare challenges the trial court's findings of fact numbers 22, 42 and 43, summarized as follows:

22. Maxicare's retro-addition/retro-deletion system identified only the one member who came in for dental care; it did not identify the nine unknown enrollees who did not seek care. DSS did not receive capitation for those nine. At best, it was paid capitation for the one member who did appear in its offices.

42. Beginning in 1987, DSS began to keep records of the temporary eligibility numbers assigned to patients, and could document 869 unlisted eligible patients who appeared for dental care between then and the time suit was filed.

43. The 869 patients represent approximately 10 percent of the true population of eligible members. Thus, even if DSS were paid for the 869, it was not paid for the other 90 percent of the unidentified eligible members.

In arriving at these findings, the trial judge considered extensive and conflicting evidence. Generally, there was testimony from DSS that it was never paid capitation for large numbers of unlisted members, while Maxicare insisted that capitation was eventually paid to DSS retroactive to the date of initial enrollment for all eligible but unlisted members. In determining the extent of the unlisted member population, the court also considered expert testimony, including the Burns and the Degner reports, and the unchallenged evidence that

the utilization rate of Maxicare's members was 10 to 13 percent.

Regarding the experts' credibility, the evidence showed and the trial judge found that Degner was employed by Maxicare until November 1, 1988; he received all his instructions and information from Maxicare California; Degner was responsible for implementing Maxicare's corporate policy. That policy, as implemented by Degner's department, did not provide accurate monthly capitation or eligibility reports to DSS. Burns was an employee of Kelsey–Seybold and was in charge of the Kelsey–Seybold database; the database utilized information sent from Maxicare California which was not altered in any way; it was used to determine eligibility information for the vast majority of Maxicare providers in Houston, not just for DSS. The Burns report was an eligibility report while the Degner report was a capitation report. The eligibility report was the report required to determine the number of eligible members for which capitation was to be paid. Maxicare had the capability to prepare and offer an eligibility report similar to the Burns report but did not request Degner to do so. Any uncertainty in the information in the Burns' report could have been corrected by Maxicare but was not.

 Another finding of which Maxicare complains is the trial court's finding that a special relationship existed between the parties and was breached by Maxicare. Not every contractual relationship involves a duty of good faith and fair dealing. *See English v. Fischer*, 660 S.W.2d 521 (Tex. 1983). However, some contracts do involve special relationships that may give rise to duties enforceable as torts. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 n. 1 (Tex.1991). In order to impose a tort duty upon parties to a contract, the court must first find that such a special relationship exists between them. *See Aranda v. Insurance Co. of N. Amer.*, 748 S.W.2d 210, 212 (Tex.1988). When special confidence is placed in one who thereby obtains a resulting superiority of position and influence, a fiduciary or confidential relationship may result. *Chien v. Chien*,

759 S.W.2d 484, 494 n. 6 (Tex.App.—Austin 1988, no writ). The existence of a special duty in the context of a contract is not inconsistent. *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex.1984). The special relationship may arise from the element of trust necessary to accomplish the goals of the contract, or because of an imbalance of bargaining power. *English*, 660 S.W.2d at 524 (concurring opinion).

 Among the factors considered by the court was the evidence that (1) DSS had no sources of information, other than information within Maxicare's control, upon which it could reasonably rely to determine which patients to treat and how much capitation it was owed, (2) DSS was totally dependent on that information and relied exclusively on Maxicare to provide it, (3) such information was crucial to DSS, and (4) Maxicare knew DSS was relying on it, knew it was failing to provide the information, and knew that it did not intend to provide the information.

The trial judge, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. He may draw reasonable inferences from the evidence and his findings may not be disregarded if the record contains some evidence of probative value from which those inferences may be drawn. *IFG Leasing*, 748 S.W.2d at 565–66; *Nicholas v. Crocker*, 687 S.W.2d 365, 367 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). Based upon the extensive conflicting evidence and reasonable inferences to be drawn therefrom, we conclude that the trial court's findings and conclusions on the contract issues, including its finding of a special relationship, are supported by legally and factually sufficient evidence. We overrule points of error three and four.

Negligent Misrepresentation.

In point of error five, Maxicare contends that there was no evidence of any misrepresentation other than the inaccurate information provided by Maxicare to DSS. Maxicare bases this conclusion on its assertion that DSS proved no "tort duty" beyond Maxicare's contractual obligations. Our holding in regard to points of error three

and four is dispositive of this point and we, therefore, overrule it.

Furthermore, we note that the trial court based its judgment and the amount of its award of damages on the contract theories, the special relationship, and the cause of action for misrepresentation. Even if there were no misrepresentation, the damages could be sustained on the basis of the other theories proven by DSS. We overrule Maxicare's fifth point of error.

Actual and Punitive Damages.

Likewise, our review of the sufficiency of the evidence in addressing Maxicare's first five points of error also disposes of Maxicare's apparent contention in point of error six that the actual damages awarded were based on insufficient evidence.

In making its conclusory argument that there is factually and legally insufficient evidence to support the actual damage award, Maxicare relies on its contention that the Burns report was inaccurate. We have already overruled this argument because (1) the trial court was the judge of the credibility of the experts and their reports and (2) the trial court properly construed against Maxicare its failure to produce information within its control to establish any inaccuracy in the Burns report.

Maxicare challenges the punitive damages awarded on the ground that there was no independent tort alleged or proved at trial. Our analysis of points of error three and four is dispositive of this point as well. DSS offered proof and the trial court found that a special relationship existed between the parties. Based on the evidence as detailed above, the judge determined that Maxicare's failure to provide accurate data, failure to track temporary eligibility data, and failure to pay capitation was a wanton and willful breach of the duties imposed by that relationship and a conscious disregard of and indifference to the rights of DSS. It was on this basis that the judge awarded exemplary damages. A party injured by the breach of the duty imposed by a special relationship is entitled to recover damages for the harm proximately resulting from the breach, including loss of income, loss of capacity to earn income, and exemplary damages. *Fisher v. Roper*, 727 S.W.2d 78, 82 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.). We overrule Maxicare's sixth point of error.

DSS's Cross–Points.

In four cross-points, DSS contends that the amount of the trial court's damage award was erroneous. DSS also raises a conditional cross-point contending that the court erred in its holding that DSS was not a consumer under the Deceptive Trade Practices Act as a matter of law. Maxicare's reply brief, filed more than one year after DSS's cross-appeal and only four days before oral submission, is too late. Tex.R.App.P. 74(m) (appellee's brief is due 25 days after appellant's brief is filed). (For purposes of the rules of appellate procedure, the appellant assumes the position of appellee in regard to a cross-appeal.) Accordingly, while we accept the supplemental authority the reply brief presents relevant to Maxicare's points of error, we do not consider the arguments raised in the brief addressing DSS's cross-points.

In cross-point number one, DSS contends that the trial court erred in subtracting Dr. Teasdale's capitation from the damage award. The trial court found that Maxicare agreed in the original contract of June 10, 1985, to transfer to DSS all of the patients of another dentist, Dr. Teasdale, effective July 1, 1985 and had a contractual obligation to do so. However, the court found that this transfer did not actually occur until June 30, 1986, one year later. DSS claimed that it was entitled to be paid capitation for those patients for the year when they were supposed to have been included in the eligibility lists but were not. We agree. Therefore, DSS was entitled to capitation in the amount of $123,600 for those patients to cover the period of Maxicare's delay in effecting the transfer. Accordingly, we sustain cross-point number one.

In its second cross-point, DSS contends that the trial court erred in calculating prejudgment interest at 10 percent on

the lump sum awarded to it. DSS argues that interest should have been calculated under the formula extablished by *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930 (Tex.1988). This formula would require the calculation to be made on each individual month's capitation at six percent. TEX. REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987).

In *Perry Roofing,* the supreme court said that article 5069–1.03, which establishes the rate of prejudgment interest at six percent, applies to "accounts and contracts ascertaining the sum payable." The court construed this provision to apply only when the contract provides the conditions on which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty. *Perry Roofing,* 744 S.W.2d at 930. In other cases, where the contract does not fix the amount of damages, "prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of TEX.REV.CIV. STAT.ANN. art. 5069–1.05, § 2." *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554 (Tex.1985).

In choosing the method of calculation that it did, the trial court impliedly found that the contract that forms the basis of DSS's suit did not fix a measure by which the sum payable could be ascertained with reasonable certainty. This conclusion is incorrect. Exhibit C to the contract fixes the rate of capitation owed to DSS Management. If Maxicare had provided timely and accurate eligibility data, the proper amount of damages for nonpayment could have been ascertained. Since the contract does provide for such sums, the trial court erred in calculating prejudgment interest based on a per annum basis. Accordingly, we sustain cross-point number two and remand this cause to the trial court for recalculation of prejudgment interest.

Cross-point number three challenges the trial court's award of $234,252 rather than $380,664.21 in actual damages. We interpret DSS's complaint to be a challenge to the factual sufficiency of the evidence. As we have previously noted, the trial court was presented with extensive conflicting evidence relevant to all the factual disputes in this case. The evidence on damages was no exception. An appellate court will not disturb a trial judge's fact findings except on a showing of no evidence. We overrule cross-point number three insofar as it requires this Court to reweigh the evidence of damages.[11]

In its fourth cross-point, DSS challenges the remittitur ordered by the trial court. DSS indicates that the court ordered it to remit $78,084, which is one-third of the amount of its actual damages, to Maxicare, but the record does not reveal the reason for the remittitur. Remittitur is proper only when the evidence is factually insufficient to support the verdict, or, as here, to support the trial court's findings of fact as to damages. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex.1987). Having previously determined that the evidence was sufficient to support the amount of damages found by the trial court, we must sustain DSS's fourth cross-point and reverse the trial court's order of remittitur.

In its fifth and conditional cross-point, DSS states that the trial court erred as a matter of law in holding it was not a consumer under the Deceptive Trade Practices Act, and conditionally asks that we reverse this ruling in the event that we reverse and remand. Alternatively and, again, on the condition that we reverse the award of exemplary damages, DSS requests that we reverse the ruling on its consumer status and sustain the punitive damage award as enhanced damages under the DTPA. Neither of the conditions expressed by DSS have materialized in our disposition. We overrule cross-point number five.

Having reversed the order for remittitur, we affirm the trial court's judgment for actual damages in the amount of $234,252 and punitive damages in the amount of $100,000. We reverse that portion of the

11. Obviously, the trial court's final award of damages is increased by our disposition of cross-points one and four. Our disposition of those points does not conflict with our holding that the evidence was sufficient to support the award of $234,252.

trial court's judgment deducting capitation payments for the Teasdale patients and render judgment that, in addition to actual damages of $234,252, DSS shall recover additional actual damages in the amount of $123,600 for a total of $357,832 in actual damages. Finally, we remand this cause to the trial court for the calculation of prejudgment interest in accordance with this opinion.