Donald K. **CRAWFORD**, et al., Appellants,

v.

**KELLY FIELD NATIONAL BANK**, Appellee.

No. 04–85–00529–CV.

Court of Appeals of Texas, San Antonio.

June 10, 1987.

Rehearing Denied July 14, 1987.

---

See also 724 S.W.2d 899.

John T. Arnold, Roanoke, for appellants.

Thomas H. Crofts, Jr., Groce, Locke & Hebdon, San Antonio, for appellee.

Before ESQUIVEL, DIAL and CHAPA, JJ.

## OPINION

ESQUIVEL, Justice.

This is an appeal from a judgment in a suit on a promissory note. The maker of the note is The Airplane Company, a partnership composed of Donald K. Crawford and William Allison, Jr. The note was guaranteed by Shelcy Mullins, Sr., Shelcy Mullins, Jr., and The Tractor Company. In addition, the note was secured by a security agreement granting the payee of the note, Kelly Field National Bank, a security interest in an airplane. The Bank, after unsuccessful demands for payment of the note, acquired possession of the airplane and sold it at a private foreclosure sale. Proceeds from the sale were applied to repossession expenses, to the payment of a repairman's lien on the airplane and to the interest and principal due on the note. The Bank then brought this suit against The Airplane Company and the guarantors to collect the remaining unpaid balance of the note. The suit was tried to the court on stipulated facts. We are concerned in this appeal primarily with the effect on the note of a subsequently executed compromise settlement agreement.

Ammex Leasing Corporation, which is not a party to the suit, acquired a 1971 Beechcraft airplane with financing obtained from the Bank. By a lease dated October 29, 1981, Ammex leased the airplane to The Airplane Company, and on the same day Ammex assigned the lease to the Bank. The Airplane Company's obligation to make lease payments was guaranteed by the defendant guarantors. While in possession of the airplane pursuant to the lease, The Airplane Company delivered it to Piedmont Aviation for engine repairs. The Airplane Company failed to pay the repair costs of $86,514.45, and Piedmont retained possession of the airplane pursuant to its possessory repairman's lien.

On June 1, 1982, Ammex executed an aircraft bill of sale to the Bank. Four days later, the Bank filed an aircraft registration application with the Federal Aviation Agency, and it became the registered owner of the airplane on August 17, 1982.

On July 31, 1982, The Airplane Company executed a promissory note to the Bank in the amount of $468,042.00. The note required monthly payments of interest, and it matured on October 29, 1982. The note was absolutely and unconditionally guaranteed by the Mullinses and The Tractor Company, and was secured by the execution of a security agreement by The Airplane Company on August 5, 1982, which granted the Bank a security interest in the airplane.

On August 19, 1982, the Bank, The Airplane Company, and Ammex entered into the compromise settlement. The pertinent provisions of this agreement are set out as follows:

> This Agreement is by and among Kelly Field National Bank ... The Airplane Company, ... and Ammex Leasing Corporation ... [.] Bank, Airplane Company, and Leasing Company are collectively referred to as "Parties" and individually as Party.
>
> WHEREAS, Airplane Company sought financing at Bank for its 100 King Air N70JL,B87,
>
> WHEREAS, Airplane Company, Bank and Leasing Company signed documents known as Lease 561,
>
> WHEREAS, Bank and Leasing Company warrant and represent that good and marketable title to the 100 King Air N70JL,B87 is held by Bank,
>
> WHEREAS, Bank and Leasing Company warrant and represent that there are no outstanding liens against said plane,
>
> WHEREAS, Bank and Leasing Company warrant and represent that all sales taxes due heretofore to the State of Virginia are fully paid,
>
> WHEREAS, Bona fide disputes and controversies exist among the parties, both as to liability and the amount thereof, if any, and by reason of such disputes and controversies the Parties hereto desire to compromise and settle all claims and causes of action of any kind whatsoever which Parties have or may have in the future arising out of such transaction, and intend that the full terms and conditions of the compromise and settlement be set forth in this Compromise Settlement Agreement.
>
> NOW, THEREFORE, for and in consideration of the recital set forth above; the rescission of all obligations of any Party arising from Lease 561 which is hereby acknowledged; the execution of a note for $468,042.00 dated July 31, 1982 by the Airplane Company and payable to the Bank, the receipt and sufficiency of which is hereby acknowledged; the transfer of the title of the 100 King Air N70JL,B87, to the Airplane Company; and the payment of $50,000.00 from Leasing Company to Bank, the receipt and sufficiency of which is hereby acknowledged; the Parties have this day released and by these presents do release, acquit, and forever discharge each other, from any and all claims or causes of action of any kind whatsoever, at common law, statutory, or otherwise, which any of the Parties has or might have, known or unknown, now existing or that might arise hereafter, directly or indirectly, attributable to the above-described transaction, it being intended to release all claims of any kind which any Party might have against any other Party hereby released, whether recited in this document or not. It is expressly understood and agreed that the terms hereof are contractual and not merely recitals, and that the Agreements herein contained and the consideration transferred is to compromise doubtful and disputed claims, avoid litigation, and buy peace, and that no payments made or other consideration given shall be construed as an admission of liability, all liability being expressly denied....

Pursuant to the compromise settlement agreement Ammex refunded the sum of $50,000.00 to the Bank, and that amount was credited on The Airplane Company's obligation. The Bank also executed an air-

craft bill of sale to The Airplane Company dated August 5, 1982.

Meanwhile, on August 13, 1982, Piedmont threatened foreclosure of its lien. It had refused to relinquish possession of the airplane until its repair bill had been paid. It received assurances from the Bank that its bill would be paid, and it finally relinquished possession of the airplane to the Bank in December of 1982. Neither The Airplane Company nor the guarantors had possession or use of the plane from the time it was sent to Piedmont for repairs.

The note matured on October 29, 1982. On October 25, 1982, the Bank wrote The Airplane Company and the guarantors that the note was in default by the amount of $13,515.51, which amount constituted unpaid interest. Although the Bank had demanded payment, neither The Airplane Company nor the guarantors had made any interest payments on the note. On January 7, 1983, the Bank notified The Airplane Company and the guarantors that it had obtained possession of the airplane and that it was going to sell it at a foreclosure sale. On January 17, 1983, the Bank notified The Airplane Company and the guarantors that it was going to sell the airplane at a private foreclosure sale and that the proceeds would be applied to pay Piedmont, repossession expenses and interest, and that the balance would be applied to the principal. The airplane was ultimately sold on January 31, 1983, at a private foreclosure sale for an amount equal to $375,000.00. The balance of the note remaining unpaid as of June 13, 1985, was $385,940.86.

The Bank filed this action on September 27, 1983, seeking recovery of the deficiency on the note from The Airplane Company and the guarantors. In the alternative, the Bank sought the value of the lease. The trial court rendered judgment on the note in favor of the Bank and against the defendants, jointly and severally, in the amount of $384,639.02 plus interest, attorney's fees and court costs. The defendants have appealed and raise five points of error. The Bank, in a cross-point, seeks damages for the prosecution by appellants of a frivolous appeal.

Appellants first two points are based on the execution of the compromise settlement agreement. They argue that the compromise settlement agreement contains no language excluding application of its complete release provisions to all of the transactions it describes. Appellants therefore conclude that the agreement releases The Airplane Company and the guarantors from their obligations on the note. The Bank counters that the note is set out in the compromise settlement agreement as consideration for its execution and that the settlement agreement cannot operate to release the consideration given for it.

■ In construing a release, an effort will be made primarily to ascertain and give effect to the intention of the parties. *Berry v. Guyer*, 482 S.W.2d 719, 720 (Tex. Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Loy v. Kuykendall*, 347 S.W.2d 726, 728 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.). The release will be considered as a whole in order to give effect to the general purpose and the true intention of the parties with respect thereto. *Loy*, 347 S.W.2d at 728. It is appropriate to construe the release in light of the facts and surrounding circumstances as shown by the record. *Houston Oilers, Inc. v. Floyd*, 518 S.W.2d 836, 838 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.).

■ Appellants are correct in pointing out that the language of the release is broad in its scope. We note, however, that general catagorical release clauses are to be narrowly construed. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984). Viewing the release as a whole in the light of the surrounding circumstances, it is our conclusion that the release did not operate to release The Airplane Company from its obligation on the note. The execution of the note is clearly set out among the items of consideration recited in the release. It appears to have been the intention of the parties that the note would be executed in exchange for the transfer of title to the airplane by the Bank to The

Airplane Company, another item of consideration recited in the release. It was not the intention of the parties to recite several items of consideration to be given for the execution of the release, and then to discharge those items by the broad, general language which followed.

While we have not been cited to, and our research has not disclosed, a Texas case on point, our holding is supported by at least two cases from other jurisdictions which hold that a release will not operate to discharge a promise for which it was the consideration. *Howerton Properties, Inc. v. Stewart,* 140 Ga.App. 10, 230 S.E.2d 75, 77 (1976); *Hill v. Whidden,* 158 Mass. 267, 33 N.E. 526, 527 (1893). Appellants' first point of error is overruled.

Appellants' argument under their second point of error is that since The Airplane Company's obligation on the note was released by the compromise settlement agreement, the guarantors are thereby released. Since we have held that The Airplane Company's obligation was not released by the settlement agreement, we likewise overrule appellant's second point of error.

■ In their third and fourth points of error, appellants contend that the Bank's failures to transfer title and deliver the airplane to The Airplane Company resulted in an absolute failure of consideration for the note thereby relieving The Airplane Company and the guarantors from any obligation under the note. Appellants point out that the compromise settlement agreement specifically provides that the Bank will transfer title to the airplane to The Airplane Company. They argue that under U.C.C. § 2.301 [1] a seller has the obligation to transfer and deliver the goods to the buyer. They assert that delivery is a condition precedent to the Bank's collection of the note, and that since delivery was never made, the appellants' obligations under the note and the guarantees never arose. U.C.C. § 2.507(a). The Bank correctly asserts that its suit is not based on a breach of the settlement agreement, but is an ac-

tion on the note. Therefore, under chapter 3 of the U.C.C., failure to deliver title to the airplane is not a condition precedent; rather it is an affirmative defense that appellants had the burden to establish. This they had failed to do.

The stipulated facts establish that the Bank is owner and holder of the note, that the note matured on October 29, 1982, that the Bank has demanded payment, that the note has not been paid, and that the guarantees have not been performed. Unless specifically denied in the pleadings, each signature on an instrument is admitted. U.C.C. § 3.307(a). Appellants did not specifically deny their signatures on the note or the guarantees. Once signatures are admitted or established, production of the instrument entitles its holder to recover unless the defendant establishes a defense. U.C.C. § 3.307(b). It is clearly the defendant's burden to establish "any and all defenses." U.C.C. § 3.307 comment 2. *See also Seale v. Nichols,* 505 S.W.2d 251, 254 (Tex.1974).

The Airplane Company and the guarantors pleaded three affirmative defenses: lack of or failure of consideration, fraudulent inducement to execute the note and guarantees, and discharge by the compromise settlement agreement. The last defense has been dealt with by our rulings on appellants' first two points of error. Further, the stipulated facts contain no indication of fraudulent inducement. It is the defense of lack of or failure of consideration upon which appellants rest their argument under their third and fourth points. They argue that the Bank failed to transfer title to the airplane to The Airplane Company as required by the compromise settlement agreement. This transfer of title means, according to appellants, delivery of the airplane itself or delivery of a bill of sale.

Physical possession of the airplane at all relevant times was with Piedmont. The Bank did not obtain possession of the airplane until after the note had matured and until after it had assured Piedmont that the

**1.** All references to the UCC are to the Texas Uniform Commercial Code located at TEX.BUS. & COM.CODE ANN. § 1.101 et seq. (Vernon 1968).

repair charges would be paid. The Airplane Company initially obtained possession of the airplane pursuant to its lease. It delivered the airplane to Piedmont for the purpose of making engine repairs. The repairs were made but The Airplane Company failed to pay from them, and Piedmont refused to relinquish possession of the airplane until it was paid. The Airplane Company could have obtained possession of the airplane from Piedmont simply by paying the repair bill. Thus, it cannot be said that the Bank failed to deliver possession of the airplane since it did not have possession until after the note had matured. The fact that the airplane was physically located at Piedmont had no effect on the Bank's transfer of title to The Airplane Company. Neither the Bank nor Piedmont ever attacked the title of The Airplane Company to the airplane.

The stipulated facts establish that the Bank executed an aircraft bill of sale to The Airplane Company on August 5, 1982. This is no evidence, however, of either delivery or of non-delivery of the bill of sale. Appellants thus have not met their burden of establishing failure of consideration by showing that the Bank failed to deliver the bill of sale to them. Points of error three and four are overruled.

In their fifth and final point of error, appellants argue that the court erred in entering judgment that the guarantors are liable to the Bank for the cost of repairs performed on the airplane by Piedmont. Appellants present two arguments under this point. First, the Bank warranted in the compromise settlement agreement that there were no liens on the airplane. Second, appellants contend that the award would extend the guarantors' liabilities beyond the express terms of the guarantees which limit their liability to the payment of all obligations arising under the note. Appellants argue that the obligation to Piedmont did not arise under the note, but was an obligation of the Banks' in accordance with its warranty given in the settlement agreement. They argue that to permit the Bank to recover the costs of the repairs would constitute a windfall to the Bank.

The Bank counters this argument by citing provisions of the security agreement. It provides at paragraph six that:

> The Secured Party shall have authority ... to ... (d) take any action which the Secured Party may deem necessary or desirable in order to realize on the Collateral, including, without limitation, the power to perform any contract....

In addition, the fourteenth paragraph of that same agreement authorizes the secured party, upon default by the borrower, to effect repairs and to pay and discharge any liens and encumbrances on the collateral, and "[a]ll sums so advanced or paid by the Secured Party shall be payable by Borrower on demand ... and shall be a part of the Secured Obligations." The Bank also cites provisions of the guaranty agreements executed by the guarantors. By those agreements, the guarantors unconditionally guaranteed to the Bank "the full and prompt payment of all debts and obligations of every kind and character arising under [the note]...." In addition, the guarantors promised to pay "all ... expenses ... incurred by [the Bank] in endeavoring to collect said indebtedness...."

■ The guarantors are liable for the costs of repairs by the plain language of their guarantees. To hold them to their guarantees provides no windfall to the Bank. The debt to Piedmont was an obligation incurred by The Airplane Company, the maker of the note guaranteed by the guarantors. The Bank had to assure Piedmont that the debt would be paid in order to obtain possession of the airplane so it could be sold in execution of the security agreement. Part of the proceeds of this sale was used to pay Piedmont. This is no windfall; the debt was incurred by The Airplane Company and the guarantors promised to pay such debts. The fifth point is overruled.

Despite the ridicule and invective directed at appellants' arguments in the Bank's brief, we cannot agree that this appeal has been taken for delay and without sufficient cause, and we decline to access the penalty provided by TEX.R.APP.P. 84. The Bank's cross-point is overruled.

The judgment of the trial court is affirmed.