**ANHEUSER–BUSCH COMPANIES, INC. and Campbell Taggart, Inc., Appellants,**

**v.**

**SUMMIT COFFEE COMPANY and the Dunnam–Snyder Company, Appellees.**

No. 05–92–00389–CV.

Court of Appeals of Texas, Dallas.

June 9, 1993.

930

Cynthia Hollingsworth, Joe B. Harrison, William G. Whitehill, Gardere & Wynne, Dallas, and Lois G. Williams, Howrey & Simon, Washington, DC, for appellants.

Doug K. Butler and Michael G. Brown, Figari & Davenport, L.L.P., Dallas, for appellees.

Before BAKER, CHAPMAN and BARBER, JJ.

## OPINION

BARBER, Justice.

This case involves disputes arising out of Campbell Taggart, Inc.'s sale of the stock of Herby's Foods, Inc. to Summit Coffee Company. Campbell Taggart and its parent, Anheuser–Busch Companies, Inc., sued Summit and its parent, The Dunnam–Snyder Company. Campbell Taggart and Anheuser–Busch sought damages for breach of obligations under a covenant not to compete and for monies expended by Anheuser–Busch to process and pay insurance claims against Herby's. Summit and Dunnam–Snyder asserted various counterclaims, including federal and state securities law violations, statutory and common law fraud, and negligent misrepresentation. The trial court rendered judgment in favor of Summit and Dunnam–Snyder, and Campbell Taggart and Anheuser–Busch appeal, asserting eighteen points of error. Summit and Dunnam–Snyder assert three cross-points of error. We reverse in part, affirm in part, render in part, modify, and remand for further proceedings.

## SUMMARY OF FACTS

### A. The Agreements

On October 26, 1987, Summit and Campbell Taggart entered into a stock purchase agreement by which Summit bought Herby's from Campbell Taggart for $5,500,000. The agreement provided for a purchase price adjustment three months after the sale, and it contemplated that the parties would execute mutual releases in connection with the adjustment of the price on the adjustment closing date. If the parties could not agree on the adjusted price, they had the right to pursue their full legal remedies. The parties were to have full access to the books and records of Herby's prior to the adjustment. The agreement provided for either reductions or increases of the initial purchase price. The final adjusted purchase price was to be reduced by the amount of any undisclosed liabilities of Herby's, except that the purchase price would be reduced by truck lease liabilities only to the extent that those liabilities exceeded $600,000.

Also on October 26, 1987, Summit, Campbell Taggart, and Anheuser–Busch entered into a covenant not to compete. Campbell Taggart and Anheuser–Busch agreed not to compete against Herby's, and Summit agreed to cause Herby's to pay $500,000 to Campbell Taggart and Anheuser–Busch, payable in five annual installments of $100,000 each. The stock purchase agreement provided that Summit should cause Dunnam–Snyder to guarantee all of the obligations of Herby's and Summit contained in both the agreement not to compete and the purchase agreement.

Because of the large deductibles applicable to some insurance claims outstanding against Herby's, Summit and Dunnam–Snyder expressed some concern about the potential uninsured exposure. As a result of these reservations, the parties entered into a side letter agreement capping Summit's liability for each insurance claim at $100,000. Campbell Taggart agreed to pay all amounts in excess of $100,000 per claim. To handle post-closing processing of the insurance claims, the parties entered into a reimbursement agreement. The agreement provided that Anheuser–Busch would continue to advance the processing costs and that Summit and Dunnam–Snyder would reimburse Anheuser–Busch for those expenses up to the agreed-upon $100,000 cap.

As the date for the final purchase price adjustment approached, the parties had disagreements about the amount of the price adjustment and representations concerning Herby's inventory. On February 1, 1988, Campbell Taggart, Summit, and Dunnam–

Snyder entered into a compromise settlement agreement and mutual release regarding their disputes. Under the agreement, Campbell Taggart paid $435,135.03 to Summit and Dunnam–Snyder. All parties agreed to release each other "from any and all causes of action of any nature whatsoever, at common law, statutory or otherwise, ... known or unknown," directly or indirectly attributable to the "above-recited disputes or controversies" and all past, present, and future obligations of Campbell Taggart in connection with sections 2, 3, and 8.4(c) of the stock purchase agreement.[1]

### B. The Litigation

In 1988, Campbell Taggart and Anheuser–Busch sued Summit and Dunnam–Snyder to recover the remaining payments due under the covenant not to compete. Only the first installment of $100,000 had been paid. They also sought the expenses that Anheuser–Busch had paid for processing insurance claims to the extent that they were within the $100,000 per claim cap.[2] Those expenses were stipulated to be $486,472.85.

Summit and Dunnam–Snyder counterclaimed, alleging that Campbell Taggart and Anheuser–Busch had misrepresented the extent of Herby's liabilities by failing to disclose some outstanding insurance claims and the terms of a Ryder truck lease. Summit and Dunnam–Snyder asserted claims of state and federal securities law violations, statutory and common law fraud, and negligent misrepresentation. It is undisputed that Campbell Taggart and Anheuser–Busch failed to disclose twenty-one insurance claims. There was conflicting evidence about the disclosures regarding the truck lease.

The jury made findings indicating that Campbell Taggart and Anheuser–Busch had violated state and federal securities law and had made material misrepresentations about Herby's liabilities. The jury found that Summit and Dunnam–Snyder had agreed to reimburse Anheuser–Busch for the insurance claim processing costs and had been unjustly enriched because of their failure to reimburse. However, the jury also found estoppel because Campbell Taggart and Anheuser–Busch had made material misrepresentations. The jury further found that Summit could not restore the status quo and that it suffered no damages as a result of the misrepresentations. The jury awarded actual and punitive damages to Dunnam–Snyder for negligent misrepresentation.

The trial court awarded rescission of the purchase price to Summit under the securities laws. The court also awarded to Dunnam–Snyder actual and punitive damages for negligent misrepresentation as found by the jury. Summit was awarded attorney fees, and both Summit and Dunnam–Snyder were awarded pre- and post-judgment interest. The court denied any relief to Campbell Taggart and Anheuser–Busch.

### RELEASE AGREEMENT

In their first point of error, Campbell Taggart and Anheuser–Busch contend that the trial court erred as a matter of law in rendering judgment for Summit and Dunnam–Snyder because their claims are barred by the release agreement. They argue that the release covers undisclosed liabilities like the ones at issue in this case. Summit and Dunnam–Snyder claim that the release is narrow and does not encompass the claims at issue. They also argue that the release is invalid under state and feder-

---

1. Section 2, entitled "Adjustments of the Purchase Price," detailed the methods and the reasons for any reductions or increases of the initial purchase price of Herby's, including reductions for undisclosed liabilities. Section 3, entitled "Adjustment Period," specified that information would be provided by the seller to the buyer and that both parties would have access to Herby's books and records prior to the final adjustment. Section 8.4(c), which is not at issue

in this case, contained representations by the seller about Herby's inventory.

2. As noted below, this lawsuit involves some undisclosed insurance claims against Herby's. However, Anheuser–Busch sought reimbursement expenses for only those claims that had been disclosed to Summit and Dunnam–Snyder.

al securities laws and that the defense of release was waived by failure to obtain jury findings on the issue.

## A. Scope of Release

### 1. Applicable Law

 A release that is valid on its face and has not been set aside is a complete bar to any later action based on matters covered by the release. *Deer Creek Ltd. v. North Am. Mortgage Co.*, 792 S.W.2d 198, 201 (Tex.App.—Dallas 1990, no writ); *DeLuca v. Munzel*, 673 S.W.2d 373, 375 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *see Hart v. Traders & Gen. Ins. Co.*, 144 Tex. 146, 149, 189 S.W.2d 493, 494 (1945). In construing a release, as with other contracts, the primary effort is to ascertain and give effect to the intention of the parties to the release, considering the instrument as a whole. *Crawford v. Kelly Field Nat'l Bank*, 733 S.W.2d 624, 627 (Tex.App.—San Antonio 1987, no writ); *Johnson v. J.M. Huber Corp.*, 699 S.W.2d 879, 882 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.); *Texas City Ref., Inc. v. Universal Oil Prods. Co.*, 681 S.W.2d 303, 305 (Tex.App.—Houston [14th Dist.] 1984, no writ); *Berry v. Guyer*, 482 S.W.2d 719, 720 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Mutual Fire & Auto Ins. Co. v. Green*, 235 S.W.2d 739, 742 (Tex.Civ. App.—Fort Worth 1950, no writ). When a release refers to a related document, the other document should be taken into consideration. *See Green*, 235 S.W.2d at 742.

 General categorical release clauses must be narrowly construed. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex.1991); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984). Generally, a release covers only existing claims or claims being urged when the release was delivered. *Berry*, 482 S.W.2d at 720. A valid release may encompass unknown damages, results, or claims that may develop in the future. *Williams v. Glash*, 789 S.W.2d 261, 264–65 (Tex. 1990); *Quebe v. Gulf, C. & S.F. Ry.*, 98 Tex. 6, 13–14, 81 S.W. 20, 21–22 (1904); *Texas City Ref.*, 681 S.W.2d at 305; *White v. Grinfas*, 809 F.2d 1157, 1160 (5th Cir.

1987) (applying Texas law). Any claims not clearly within the subject matter of the release are not discharged, even if they existed when the release was executed. *Brady*, 811 S.W.2d at 938; *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 204 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). The release must "mention" the claim to be released. *Brady*, 811 S.W.2d at 938.

### 2. Application of Law

We determine, based on the language of the release, that the parties intended the release to encompass the claims raised by Summit and Dunnam–Snyder. The release states that the parties had disagreements about the final adjusted purchase price of Herby's, referring specifically to sections 2 and 3 of the stock purchase agreement. Section 2 provides that the adjusted purchase price shall be reduced to the extent of undisclosed liabilities. Section 2 even makes specific reference to liabilities regarding truck leases. Undisclosed liabilities, including undisclosed liabilities involving the terms of the Ryder truck lease, are at the heart of this lawsuit.

Thus, the purchase agreement contemplated the existence of undisclosed liabilities and provided for a purchase price reduction to the extent of such undisclosed liabilities. The release, in turn, specifically refers in the initial recitals to these sections of the purchase agreement and the disagreements regarding the adjusted purchase price. For the substantial consideration of over $435,000, and "in consideration of the [r]ecitals set forth above," Summit and Dunnam–Snyder released "any and all causes of action of any nature whatsoever, at common law, statutory or otherwise," which they "have or might have, known or unknown, now existing or that might hereafter directly or indirectly be attributable to ... the above-recited disputes and controversies."

 Although the release contains some broad language, when read as a whole it is specific about its scope. Even if we were to determine that the release con-

tains some "general, categorical release clauses," by reading the release as a whole and using the language of the recitals to restrict the broader language which follows, we give the mandated narrow construction to such clauses. Having done so, we determine that the claims asserted by Summit and Dunnam–Snyder in this lawsuit, all of which involve undisclosed Herby's liabilities, are within the scope of the release. That the release does not specifically mention fraud or securities law claims is irrelevant. The release, by reference to the stock purchase agreement, mentions *all* claims involving undisclosed liabilities, a specific class of claims that includes the claims at issue. Although perhaps unknown to Summit and Dunnam–Snyder when the release was executed, the record demonstrates that the claims, if valid, existed at that time. When parties specifically agree that they intend to release both "known and unknown" claims, we are required to honor and give effect to their agreement.

### B. Validity of Release Under Securities Laws

#### 1. Applicable Law

Both the federal and state securities statutes contain anti-waiver provisions. *See* 15 U.S.C.A. § 77n (West 1981); TEX.REV.CIV. STAT.ANN. art. 581–33(L) (Vernon Supp. 1993). The Texas provision is "essentially the same" as the federal provision. TEX. REV.CIV.STAT.ANN. art. 581–33 cmt. (Vernon Supp.1993). The comment following the Texas statute states that the anti-waiver provision does not apply to, and therefore does not diminish the effectiveness of, a bona fide release or settlement of an existing claim, whether or not a suit has been filed. *Id.*

■ Despite the federal anti-waiver provisions, settlements or releases of claims involving violations of federal securities laws are not void as a matter of law, but the right to sue granted by those laws should be preserved against unintentional or involuntary waiver. *Murtagh v. University Computing Co.*, 490 F.2d 810, 816 (5th Cir.), *cert. denied,* 419 U.S. 835, 95

S.Ct. 62, 42 L.Ed.2d 62 (1974). A release of federal securities law claims is valid only as to mature, ripened claims of which the releasing party has actual knowledge or which the party could have discovered upon reasonably inquiry. *Goodman v. Epstein,* 582 F.2d 388, 402–04 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Doody v. E.F. Hutton & Co.,* 587 F.Supp. 829, 832 (D.Minn.1984); *see American Gen. Ins. Co. v. Equitable Gen. Corp.,* 493 F.Supp. 721, 750–51 (E.D.Va.1980). A release negotiated at arm's length and not the product of duress, fraud, or mutual mistake, which relates to matured claims of past federal securities law violations and does not excuse future violations, is valid and should be given its full legal effect. *Weinraub v. International Banknote Co.,* 422 F.Supp. 856, 858 (S.D.N.Y.1976).

#### 2. Application of Law

The federal cases applying the federal anti-waiver provision, particularly the *Goodman v. Epstein* opinion, are well reasoned and persuasive. Because the Texas provision is essentially the same as the comparable federal provision, we adopt and follow the reasoning and holdings in the above-cited federal cases in applying the Texas anti-waiver provision.

■ The record shows that the claims asserted by Summit and Dunnam–Snyder were mature and in existence at the time the parties executed the release. The next question is whether Summit or Dunnam–Snyder had actual knowledge at that time of the existence of the claims or whether the claims were subject to discovery upon reasonable inquiry. Despite some compelling evidence that Summit and Dunnam–Snyder either knew or should have known of the facts underlying their claims when they executed the release, the jury found that they did not have either actual or constructive knowledge until August 12, 1988, more than six months *after* the release was executed.

Campbell Taggart and Anheuser–Busch have not asserted on appeal that the jury

finding is in any way erroneous. Therefore, the finding is binding on the parties and this Court and must be treated as conclusively established. *See Crain v. Hill County*, 613 S.W.2d 367, 369 (Tex.Civ. App.—Waco 1981, writ ref'd n.r.e.); *Harvey v. Denton*, 601 S.W.2d 121, 125 (Tex. Civ.App.—Eastland 1980, writ ref'd n.r.e.); *Dallas Transit Co. v. Young*, 370 S.W.2d 6, 10 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.). Accordingly, because Campbell Taggart and Anheuser–Busch do not challenge the finding that Summit and Dunnam–Snyder had neither actual nor constructive knowledge of the facts giving rise to their securities law claims at the time the release was executed, the release is not effective to bar those claims.

### C. Waiver of Release Defense

A question remains about whether the release is effective to bar Summit and Dunnam–Snyder's other claims, there being no statutory bar to its effectiveness regarding those other claims. Summit and Dunnam–Snyder contend that Campbell Taggart and Anheuser–Busch waived their defense based on the release because they failed to obtain any jury findings on the issue. We disagree.

### 1. Applicable Law

The trial court shall submit to the jury controlling questions raised by the pleadings and the evidence. TEX.R.CIV.P. 278; *see Martin v. United States Trust Co.*, 690 S.W.2d 300, 310 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). On the other hand, when facts are undisputed or conclusively established, there is no need to submit the issue to the jury. *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex.1971); *Martin*, 690 S.W.2d at 310. It is elementary that legal questions should not be submitted to the jury. *C & C Partners v. Sun Exploration & Prod. Co.*, 783 S.W.2d 707, 715 (Tex. App.—Dallas 1989, writ denied).

Construction of an unambiguous contract is a legal issue to be decided by the court. The jury resolves only *factual* disputes about the conduct of the contracting parties if such disputes remain after the trial court has determined the parties' respective obligations under the contract. *See ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 253 n. 3 (Tex.App.—Dallas 1990, no writ); *see also S & D Group, Inc. v. Talamas*, 710 S.W.2d 680, 683 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) (construction of unambiguous contract is question of law; jury may not be asked to construe legal effect of contract).

The question of whether a contract is ambiguous is a question of law. If a contract is so worded that a court may properly give it a certain or definite legal meaning, it is not ambiguous. A contract is ambiguous only when the application of pertinent rules of interpretation result in genuine uncertainty about which one of two or more meanings is the proper meaning. *C & C Partners*, 783 S.W.2d at 714.

### 2. Application of Law

No party pleaded that the release is ambiguous. The record indicates that all parties and the court treated construction of the release as a legal question. Our prior discussion of the scope of the release establishes that the release is unambiguous and that it encompasses the claims at issue in this case. Accordingly, there was nothing further to submit to the jury concerning the release, and Campbell Taggart and Anheuser–Busch did not waive their defenses based on the release.

Based on the foregoing, our holdings regarding the release are as follows. The release covers all of the claims asserted by Summit and Dunnam–Snyder. However, because of the anti-waiver provisions in the state and federal securities laws, and because of the jury's uncontested finding that Summit and Dunnam–Snyder had neither actual nor constructive knowledge of the facts underlying their claims when the release was executed, the release does not bar the securities law claims. On the other hand, because there is no bar to the effectiveness of the release regarding the remainder of Summit and Dunnam–Snyder's claims, those claims are barred because they were contractually released. Accord-

ingly, we sustain in part the first point of error.

## MATERIALITY OF MISREPRESENTATIONS

In the second point of error, Campbell Taggart and Anheuser–Busch maintain that the evidence was either legally or factually insufficient to support the jury's findings that they made any statements or omissions that were material or misleading.

### A. Standards of Review

In reviewing a no evidence point, we consider only the evidence and inferences that tend to support the challenged findings. All evidence and inferences to the contrary are disregarded. *Jacobs v. Danny Darby Real Estate, Inc.*, 750 S.W.2d 174, 175 (Tex.1988). We uphold the jury's findings if there is more than a scintilla of probative evidence to support them. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 795 n. 3 (Tex.1991). Evidence that creates a mere surmise or suspicion of the existence of a fact is no more than a scintilla and has no legal effect. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

In reviewing a factual insufficiency point, we consider and weigh all of the evidence. The jury findings must be upheld unless the evidence is so weak or the findings are so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Levinge Corp. v. Ledezma*, 752 S.W.2d 641, 643 (Tex.App.—Houston [1st Dist.] 1988, no writ). The jury weighs the evidence and determines the credibility of the witnesses. We do not substitute our judgment for that of the jury, even if a different answer could have been reached on the evidence. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

### B. Applicable Law

■ An omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest. Stated another way, there must be a substantial likelihood that proper disclosure would have been viewed by the reasonable investor as significantly altering the total mix of information made available. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Bridwell v. State*, 804 S.W.2d 900, 903–04 (Tex.Crim.App.1991). An investor is not required to prove that he would have acted differently but for the omission or misrepresentation. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132.

### C. Sufficiency Review

#### 1. Legal Sufficiency

■ One of the alleged misrepresentations was Campbell Taggart's representation that the Herby's Ryder truck lease had a fixed *monthly* charge of $87.13 per truck. However, the actual charge was $87.13 *weekly*. It is obvious that this misrepresentation substantially understated the cost of the truck lease. There was evidence that Summit and Dunnam–Snyder made profit projections regarding Herby's using the erroneous figures supplied by Campbell Taggart and that the actual expenses wiped out the projected profits for the first two years after acquisition.

It was undisputed that Campbell Taggart failed to disclose twenty-one insurance claims outstanding against Herby's. The importance of pending insurance claims is demonstrated by the fact that Summit and Dunnam–Snyder raised concerns about potential exposure due to *disclosed* claims and their associated high deductibles. This concern led to a side agreement at closing which capped Summit's liability on the disclosed claims. The amount ultimately paid on the undisclosed claims approached $600,-000.[3] William Snyder, president and director of Summit, testified that Summit would not have purchased Herby's if full disclosure about the truck lease and the insurance claims had been made.

---

**3.** Campbell Taggart and Anheuser–Busch eventually paid all of the undisclosed claims. However, we view this fact as irrelevant to whether their failure to disclose was material.

There was ample evidence that the omissions and misrepresentations were material in the sense that the correct information would have been important to a reasonable investor and buyer. The no evidence contention has no merit.

### 2. Factual Sufficiency

Campbell Taggart and Anheuser–Busch argue that the evidence of material misrepresentations was insufficient because the parties contemplated in their purchase agreement the possibility of undisclosed Herby's liabilities, and they provided for that contingency. The purchase agreement provided that Campbell Taggart would indemnify Summit for any losses over $200,000 suffered because of any inaccurate representations. According to Campbell Taggart and Anheuser–Busch, Summit and Dunnam–Snyder cannot claim to have been materially misled because they received a limitation on their losses and they acknowledged that the failure of Herby's had nothing to do with the misrepresentations.

This argument misses the point, which is whether there is a substantial likelihood that the omissions and misrepresentations would have been important to the decision-making process of a reasonable investor and buyer. The jury was presented with substantial evidence that the undisclosed and incorrect information was indeed important to the buying decision. Furthermore, the jury might well have determined that the $200,000 for which there was no indemnification could have been an important factor in the buying decision. Nothing in the purchase agreement states that the indemnity was to be the sole remedy. Although they did not have to prove it to establish materiality, Summit and Dunnam–Snyder provided evidence that Herby's would not have been purchased had full and correct disclosure been made. Thus, even if the misrepresented facts had nothing to do with why Herby's ultimately failed, the fact remains that *no* losses would have been suffered if Summit had not bought Herby's.

The evidence was factually sufficient to support the jury's findings that there were material omissions and misrepresentations. We overrule the second point of error.

## ADMISSION OF DEPOSITION TESTIMONY

In their third point of error, Campbell Taggart and Anheuser–Busch contend that the trial court erred in admitting the deposition testimony of a witness, George Willis, because he was not identified in discovery responses as a person with knowledge of relevant facts.

### A. Pertinent Facts

The record shows that George Willis worked for Chuckwagon Foods, a company owned by Summit and Dunnam–Snyder. Upon Summit's acquisition of Herby's, Chuckwagon was to be merged with Herby's. After Summit bought Herby's, Willis became part of Herby's management. Prior to the acquisition of Herby's, Willis accompanied William Snyder and others on a trip for the purpose of visiting Herby's operations and talking to Herby's personnel.

At trial, Campbell Taggart and Anheuser–Busch called Tommy Jeffrey, a Herby's employee prior to the acquisition, as a witness. Jeffrey testified that he told Willis that the Ryder truck lease cost was about $87 per week. In response, Summit and Dunnam–Snyder called Willis as a witness by deposition. Willis denied that Jeffrey had told him about the truck lease charge, saying that he had no knowledge of the terms of the lease prior to the acquisition.

### B. Applicable Law

A party who fails to respond to or supplement his response to a request for discovery shall not be entitled to present evidence which the party was under a duty to provide or to offer the testimony of an expert witness or of any other person having knowledge of discoverable matter unless the trial court finds good cause for admission of the evidence. The party offering the evidence bears the burden of establishing good cause, and good cause

must be shown in the record. TEX.R.CIV.P. 215(5).

Rule 215(5) is intended to require complete discovery responses in order to promote settlement and prevent trial by ambush. The sole sanction, exclusion of evidence, is automatic unless there is good cause to excuse its imposition. The good cause exception permits a trial court, exercising its discretion, to excuse a failure to comply in difficult or impossible circumstances. *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex.1992) (op. on motion for reh'g). The erroneous admission of evidence when good cause is not shown is subject to a harmless error analysis. *See id.* at 917; *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989).

Error is reversible only when it amounts to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b)(1). The determination of whether the error was harmful is made in light of the record as a whole. *McKinney v. National Union Fire Ins. Co.*, 772 S.W.2d 72, 75 (Tex.1989) (op. on reh'g). Erroneous admission of evidence is harmless if the evidence is cumulative or not controlling on a material issue dispositive of the case. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990); *Gee*, 765 S.W.2d at 396. If the judgment is not controlled by the testimony that should have been excluded, there is no reversible error. *Mancorp*, 802 S.W.2d at 230. Ordinarily, improper admission of evidence does not constitute reversible error if other evidence supports the finding in question. *Gee*, 765 S.W.2d at 397.

### C. Application of Law

When Campbell Taggart and Anheuser–Busch objected to testimony from Willis, the trial court heard argument of counsel on the issue.[4] Although Summit and Dunnam–Snyder provided arguably good reasons why they did not consider

Willis as a witness to be called at trial, those reasons do not really address the failure to list him as a person with knowledge of relevant facts. We will assume, without deciding, that the trial court erred in allowing Willis to testify.

The next question is whether the admission of Willis's testimony was harmful error. Campbell Taggart and Anheuser–Busch emphasize the fact that his testimony was the only testimony directly contradicting Jeffrey's testimony that Willis was told of the correct truck lease cost prior to the sale of Herby's. However, there was other evidence that Summit and Dunnam–Snyder were misinformed about the cost of the Ryder truck lease. The three people who were responsible for negotiating the purchase agreement for Summit and Dunnam–Snyder were all given incorrect information. At the pertinent time, Willis worked for Chuckwagon, and it was not clearly established that he was an agent of either Summit or Dunnam–Snyder. Thus, even if the jury had been convinced that Willis became aware of the correct truck lease charge, such knowledge might not have been attributable to Summit or Dunnam–Snyder or those who made the decision to purchase Herby's.[5]

There was also undisputed evidence of the failure to disclose twenty-one insurance claims pending against Herby's. Willis's testimony had nothing to do with these omissions. Snyder testified that Herby's would not have been bought had these claims been disclosed. Thus, the jury could have based its findings on the undisclosed insurance claims alone. Based on the record, even assuming it was error to allow Willis to testify, we hold that the admission of Willis's testimony was not harmful or reversible error. We overrule the third point of error.

### AVAILABILITY OF RESCISSION

In the fourth point of error, Campbell Taggart and Anheuser–Busch contend that

---

4. In disposing of this point of error, we do not decide whether argument of counsel alone is sufficient to support an implied finding of good cause.

5. The jury was instructed on corporate knowledge.

the trial court erred as a matter of law in disregarding the jury's finding that the parties could not be restored to the status quo ante and in awarding rescissionary damages to Summit.

## A. Applicable Law

The federal statute states that the buyer "may sue either at law or in equity ... to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C.A. § 77*l* (West 1981). Our state statute provides that the purchaser "may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." TEX.REV.CIV. STAT.ANN. art. 581–33(A)(2) (Vernon Supp. 1993).

 Regarding the federal securities law, rescission is generally an exchange meant to return the parties to a status quo, and can only take place if the purchaser returns the stock he received. The plaintiff is given no choice of remedy. If he owns the stock, he is entitled to rescission but not damages. If he no longer owns the stock, he is entitled to damages but not rescission. *Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir.1979). The statute prescribes the remedy of rescission except where the defrauded buyer no longer owns the security, in which case he is entitled to a rescissory measure of damages. *Randall v. Loftsgaarden*, 478 U.S. 647, 655–56, 106 S.Ct. 3143, 3148–49, 92 L.Ed.2d 525 (1986).

 "[B]y enabling the victims of ... fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud." *Id.* at 659, 106 S.Ct. at 3151. The plaintiff buyer is entitled to rescission whether or not the misrepresentations caused the bankruptcy of the business invested in.

*Casella v. Webb*, 883 F.2d 805, 808–09 (9th Cir.1989).

Because the state and federal statutes contain virtually the same wording, decisions of federal courts applying the federal law are reliable guides to application of the comparable state provisions. *First Mun. Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart*, 648 S.W.2d 410, 414 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). Texas courts look to federal court decisions because of the obvious similarities between the state and federal statutes. *Star Supply Co. v. Jones*, 665 S.W.2d 194, 196 (Tex.App.—San Antonio 1984, no writ).

## B. Application of Law

 Our reading of the controlling federal cases indicates that restoration of the status quo ante is not a binding prerequisite to the remedy of rescission. The United States Supreme Court has expressed the opinion that restoration of the status quo is only *one* goal sought to be served by the remedy of rescission. Moreover, the Court indicated that the concern is with restoration of the *plaintiff's* position, not necessarily the defendant's. *Randall v. Loftsgaarden*, 478 U.S. at 659, 106 S.Ct. at 3151. Thus, the federal statute shifts risk of any decline in the security's value to the defendant. Moreover, a federal court has indicated that rescission is appropriate in a case, like this one, where the business invested in became bankrupt, a situation where the status quo ante obviously no longer prevails. *See Casella v. Webb*, 883 F.2d at 808–09.

Also, the federal courts have held that rescission is the exclusive remedy when the plaintiff still owns the stock. If an inability to restore the status quo barred rescission, the sole remedy would be unavailable. We do not believe that either Congress or the Texas Legislature intended such a result.

We determine that the Texas provision should be applied in accordance with the federal provision.[6] We hold that Summit,

---

6. We are aware that the Texarkana court of appeals recently held that defrauded buyers could recover damages even though they still owned the securities. *See Lutheran Bhd. v. Kid-*

because it still owned the Herby's stock, was entitled to the remedy of rescission. We overrule the fourth point of error.

## SECONDARY TRADING

In their fifth point of error, Campbell Taggart and Anheuser–Busch argue that the trial court erred as a matter of law in rendering judgment because the state and federal securities acts are inapplicable to a secondary trading transaction as in this case.

### A. Applicable Law

The federal district courts are split on this issue, and no federal court of appeals had directly addressed the issue as of 1990. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 203 (3d Cir.1990); *Mix v. E.F. Hutton & Co.*, 720 F.Supp. 8, 10–11 & n. 3 (D.D.C.1989). In 1991, the Third Circuit held that section 77*l* applied only to initial offerings of securities, not to after-market trading. *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687–93 (3d Cir.), ·cert. denied, —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

In *Ballay*, the court first noted that the federal provision refers to misrepresentations in "a prospectus or oral communication." The court decided that the oral communication referred to must be one related to a prospectus or initial offering. The court also decided that Congress used the term "prospectus" as a term of art describing the transmittal of information concerning the sale of a security in an initial distribution. Thus, if "oral communication" was given an expansive reading, it would lead to the anomalous result that buyers could recover for negligent oral misrepresentations under section 77*l* but could only recover upon proof of scienter under section 78j(b) and SEC Rule 10b–5 if the misrepresentation was contained in a written prospectus. *Id.* at 688–89.

Secondly, the court determined that Congress generally intended to regulate initial offerings with the Securities Act of 1933, which contains section 77*l*. The Securities Exchange Act of 1934, on the other hand, was enacted to regulate securities exchanges and over-the-counter markets, where secondary trading takes place. The court relied on a House Report on the 1933 Act for the proposition that it regulates only initial offerings. *Id.* at 690.

Next, the court acknowledged that section 77q(a), although within the 1933 Act, applies to *all* trading. However, the court held that this fact did not lend support to the idea that section 77*l* also applies to all trading, basing this holding on differences of language in the two sections and the clear legislative history of section 77q(a). Finally, the court noted that, if secondary trading were actionable under section 77*l*, the use of section 78j(b) and rule 10b–5 would be eliminated because of section 77*l*'s more lenient proof requirements. *Id.* at 691–93.

Although the issue was not squarely presented, the United States Supreme Court has indicated that section 77*l* would apply to the secondary sale of all of the outstanding stock of a business. The question decided by the Court was whether the antifraud provisions of the 1933 and 1934 Acts apply to the sale of one hundred percent of the stock of a closely-held corporation. More specifically, the Court was addressing the argument that the stock of such a corporation is not a security covered by the Acts. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 683–85, 105 S.Ct. 2297, 2300–01, 85 L.Ed.2d 692 (1985). The Court held that such a transaction was subject to the Acts, specifically rejecting an argument that the Acts were intended to cover only passive investors and not privately negotiated transactions involving the transfer of control to entrepreneurs. *Id.* at 692, 697, 105 S.Ct. at 2305, 2307.

### B. Application of Law

We find ourselves in agreement with most of what the Third Circuit court stated

der Peabody & Co., 829 S.W.2d 300, 307 (Tex. App.—Texarkana), *judgment set aside and cause remanded for rendition of agreed judgment,* 840 S.W.2d 384 (Tex.1992). We do not agree with

this interpretation of the Texas statute. In any case, because damages are awarded using a rescissory measure, the distinction between the two remedies may be relatively unimportant.

in *Ballay*. However, we do not believe that the court's holding was as broad as Campbell Taggart and Anheuser–Busch assert.

The *Ballay* court basically made distinctions between initial offerings of securities and secondary trading of those securities on exchanges. When the court stated that section 77*l* applied only to initial offerings, it did so in the context of its discussion of such offerings as distinguished from secondary trading. The transaction at issue in this case is something of a hybrid, namely the sale by *one* owner of *all* of a company's stock.

As the *Ballay* court stated, the House Report on the 1933 Act noted that the statute affects only new offerings *or sales with the characteristics of new offerings:*

> The bill affects only new offerings of securities sold through the use of the mails or of instrumentalities of interstate or foreign transportation or communication. It does not affect the ordinary redistribution of securities *unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering.*

H.R.REP. No. 85, 73rd Cong., 1st Sess. 5 (1933) (emphasis added). Elsewhere, in a part not quoted by the *Ballay* court, the report states:

> All the outstanding stock of a particular corporation may be owned by one individual or a select group of individuals. At some future date they may wish to dispose of their holdings and to make an offer of this stock to the public. Such a public offering may possess all the dangers attendant upon a new offering of securities. *Wherever such a redistribution reaches significant proportions, the distributor would be in the position of controlling the issuer and thus able to furnish the information demanded by the bill. This being so, the distributor is treated as equivalent to the origi-*

*nal issuer and, if he seeks to dispose of the issue through a public offering, he becomes subject to the act.* The concept of control herein involved is not a narrow one, depending upon a mathematical formula of 51 percent of voting power, but is broadly defined to permit the provisions of the act to become effective wherever the fact of control actually exists.

*Id.* at 13–14 (emphasis added).

Thus, the legislative history indicates that section 77*l* of the 1933 Act applies to initial offerings *and* to sales of securities that have the characteristics of initial offerings due to the seller's control and access to information. The *Landreth* case decided by the United States Supreme Court supports this conclusion by holding that the sale of all of the stock of a closely held corporation is subject to the anti-fraud provisions of the 1933 Act.

We hold that section 77*l* is applicable to the transaction at issue in this case, a transaction involving the sale by one owner of all of the stock of Herby's.[7] We find nothing in the Texas statute suggesting that it does not also apply. In fact, the language in the Texas statute is arguably broader than the comparable federal language. Accordingly, we hold that the Texas statute should be applied in accordance with our interpretation of the federal statute. We overrule the fifth point of error.

## NEGLIGENT MISREPRESENTATION

We have previously held that Summit and Dunnam–Snyder's claims of negligent misrepresentation are barred by the release agreement. Therefore, all relief awarded based on those claims must be reversed. Accordingly, we need not address points of error six through ten.

## REIMBURSEMENT

▮ In points of error eleven, twelve, and thirteen, Campbell Taggart and Anheu-

---

7. We do not think that our narrow holding is inconsistent with *Ballay*. The *Ballay* court noted that the House Report indicates that sales akin to new offerings are covered by the 1933 Act. Further, applying the Act to such sales does not eliminate the usefulness of section 78j(b) and rule 10b–5, which will remain applicable to secondary sales of securities on exchanges and over-the-counter markets.

ser–Busch contend that the trial court erred in disregarding jury findings supporting recovery on the reimbursement agreement regarding the cost of processing disclosed insurance claims. They maintain in the fourteenth point of error that the trial court erred in refusing to render judgment for Campbell Taggart and Anheuser–Busch because there is no evidence or insufficient evidence to support the jury's findings of estoppel.

### A. Applicable Law

■ The applicable rule on appellate briefing states:

> A brief of the argument may present separately or grouped the points relied upon for reversal. The argument *shall* include: (1) a fair, condensed statement of the facts pertinent to such points, *with reference to pages in the record where the same may be found;* and (2) *such discussion of the facts* and the authorities relied upon as may be requisite to maintain the point at issue.

Tex.R.App.P. 74(f) (emphasis added). An appellant bears the burden of discussing its assertion of error and pointing the appellate court to the portions of the record that support a complaint that jury answers are unsupported by evidence. *Barham v. Turner Constr. Co.,* 803 S.W.2d 731, 740 (Tex. App.—Dallas 1990, writ denied). An appellate court has no duty to search a voluminous record without guidance from the appellant to determine whether an assertion of reversible error is valid. *Id.; Most Worshipful Prince Hall Grand Lodge v. Jackson,* 732 S.W.2d 407, 412 (Tex.App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

### B. Application of Law

Although the jury made findings favorable to the reimbursement claim, it also made findings that Campbell Taggart and Anheuser–Busch were estopped from asserting the claim. Although Campbell Taggart and Anheuser–Busch attack the findings of estoppel, they provide no argument on the assertion that the findings are unsupported by evidence. Campbell Taggart and Anheuser–Busch do nothing more than summarily state that "there was no or insufficient evidence to support those findings," citing only to the jury findings themselves. There is no reference to the circumstances surrounding the reimbursement agreement. Essentially, there is no briefing of their contention. Because Campbell Taggart and Anheuser–Busch have waived the error asserted in the fourteenth point of error, we overrule points of error eleven through fourteen.[8]

### COVENANT NOT TO COMPETE

Campbell Taggart and Anheuser–Busch argue in the fifteenth point of error that the trial court erred in refusing to direct a verdict and refusing to render judgment in their favor for breach of the covenant not to compete. Campbell Taggart and Anheuser–Busch contend that the agreement was breached as a matter of law. Alternatively, they maintain that the jury finding of no breach is against the great weight and preponderance of the evidence. Summit and Dunnam–Snyder argue in their second cross-point of error that any breach was excused because of impossibility of performance.

### A. Pertinent Facts

Summit, Campbell Taggart, and Anheuser–Busch entered into an agreement in which Campbell Taggart and Anheuser–Busch agreed not to compete with Herby's. Summit agreed to cause Herby's to pay $500,000 in five annual installments of $100,000 to Campbell Taggart and Anheuser–Busch. Herby's paid only the first installment of $100,000. Herby's went into bankruptcy about three weeks before the second installment was due to be paid. The jury found that Summit neither breached nor repudiated the covenant not to compete agreement.

**8.** Summit and Dunnam–Snyder respond to point fourteen by arguing that the substantial evidence of material misrepresentations supports the jury's estoppel findings. As discussed previously in this opinion, we determined that the evidence supported the jury's findings of material misrepresentations.

Questions asking about the affirmative defenses of estoppel, failure of consideration, and impossibility of performance were also submitted to the jury. However, because answers to those questions were conditioned upon affirmative findings of breach or repudiation, the jury did not answer the questions.

## B. Applicable Law

■ We have previously discussed the standards of review for legal and factual insufficiency points. Because Campbell Taggart and Anheuser–Busch had the burden of proving breach of the covenant not to compete, they are asserting "matter of law" points and "against the great weight and preponderance" points. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). A party asserting a "matter of law" point must surmount two hurdles. First, the record is examined for any evidence supporting the jury's finding, disregarding all evidence to the contrary. Second, if there is no evidence to support the finding, the entire record must be examined to see if the contrary proposition is established as a matter of law. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982).

## C. Application of Law

The record shows that it was undisputed that the 1988 payment of $100,000 was made. It was also undisputed that Summit did not cause Herby's to make any of the remaining payments due under the covenant not to compete. Finally, it was undisputed that Campbell Taggart and Anheuser–Busch did not compete against Herby's. Thus, there was no evidence supporting the jury's finding that Summit did not breach the contract. Further, the fact that

Summit did breach the agreement was established as a matter of law.

However, Summit raised affirmative defenses of estoppel, failure of consideration, and impossibility of performance. Because the legal question of whether there was a breach of the covenant not to compete was improperly submitted to the jury,[9] no findings were obtained upon these affirmative defenses.[10] Although Summit maintains that impossibility was established as a matter of law, we determine, based on the briefs and the record, that we cannot decide the issue as a matter of law. Thus, although we find that breach of the agreement was established as a matter of law, we conclude that we cannot render judgment on any of the affirmative defenses.[11] Accordingly, the issues regarding affirmative defenses to Summit's breach of the covenant not to compete must be remanded for further proceedings. The associated issues of entitlement to attorney fees must also be remanded. We sustain in part the fifteenth point of error, and we overrule the second cross-point.

## ATTORNEY FEES

In their sixteenth and seventeenth points of error, Campbell Taggart and Anheuser–Busch contend that the trial court erred in failing to award them attorney fees. They argue that Summit and Dunnam–Snyder's contractual liability under the reimbursement agreement and covenant not to compete was conclusively established. Campbell Taggart and Anheuser–Busch also maintain that the jury's finding of no reasonable attorney fees is against the great weight and preponderance of the evidence.

We have determined that Campbell Taggart and Anheuser–Busch waived any error regarding the jury's finding that they were estopped from recovery on the reimbursement agreement. We have also con-

---

**9.** See our prior discussion concerning waiver of the defense of release.

**10.** We do not agree with Summit's assertion that the findings of estoppel made in connection with other claims can be imported as a defense to the claim of breach of the covenant not to compete.

**11.** Summit also argues that the covenant not to compete is unenforceable because the findings of fraud vitiate the agreement. On the briefs and record before us, we do not think that this issue is ripe for resolution as a matter of law. If Summit wishes, it may pursue the issue upon retrial following remand.

cluded that the issues concerning affirmative defenses to breach of the covenant not to compete must be remanded for further proceedings. As noted above, the right to attorney fees in connection with Summit's breach of the covenant not to compete must be resolved along with resolution of the issues concerning Summit's affirmative defenses. Accordingly, we overrule the sixteenth and seventeenth points of error.

## PREJUDGMENT INTEREST

In the eighteenth point of error, Campbell Taggart and Anheuser–Busch argue that the trial court erred in awarding prejudgment interest compounded annually. They contend that simple interest is statutorily required. *See* TEX.REV.CIV.STAT. ANN. art. 5069–1.05, § 6(g) (Vernon Supp. 1993). Summit and Dunnam–Snyder disagree, and they argue in their third cross-point of error that the prejudgment interest awarded should be based on equity and increased by daily compounding.

### A. Applicable Law

Section 6 of article 5069–1.05 is the result of 1987 tort reform legislation and codifies *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), with some modifications. John T. Montford & Will G. Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System,* 25 HOUS.L.REV. 59, 102–03 (1988). By its terms, section 6 applies only to wrongful death, personal injury, and property damage tort cases. *Id.; see Olson v. Bayland Publishing, Inc.,* 781 S.W.2d 659, 666–67 (Tex.App.—Houston [1st Dist.] 1989, writ denied); *Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.,* 739 F.Supp. 338, 340–41 (S.D.Tex.1990) (applying Texas law), *aff'd,* 956 F.2d 265 (5th Cir.1992). In contrast with the statutory enactments, Cavnar holds that equitable prejudgment interest is to be compounded daily. *Cavnar,* 696 S.W.2d at 554.

The Texas Legislature's codification and modification of *Cavnar* and its progeny in wrongful death, personal injury, and property damage cases did not purport to provide a statutory framework for prejudgment interest in all cases. In section 2 of article 5069–1.05, the legislature provided for interest to accrue on "all judgments." TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 2 (Vernon Supp.1993). In section 6, however, the legislature specifically limited statutory prejudgment interest under that article to "[j]udgments in wrongful death, personal injury, and property damage cases." *Id.* § 6(a). If the legislature had intended to codify the award of prejudgment interest in all cases, section 6(a) would read "all judgments." The legislature's intent to limit the types of cases to which section 6 applies is exemplified by the addition of section 7, which specifically provides for prejudgment interest in condemnation cases. *See id.* § 7.

Wrongful death, personal injury, and condemnation are not at issue in this case. Thus, section 6 of article 5069–1.05 is applicable only if property damage is in issue. "[P]roperty damage" as used in section 6 of article 5069–1.05 means damage to tangible property, not economic loss or loss of economic opportunity. *Spangler v. Jones,* No. 05–92–01472–CV, slip op. at 14–15, 1993 WL 174276 (Tex.App.—Dallas May 25, 1993, n.w.h.) (en banc); *Associate Tel. Directory Publisher, Inc. v. Five D's Publishing Co.,* 849 S.W.2d 894, 900 (Tex. App.—Austin 1993, no writ).

### B. Application of Law

The damages which were in issue in this case do not constitute "property damage" as that term is used in section 6 of article 5069–1.05; therefore, *Cavnar* controls the awarding of prejudgment interest. *See Spangler,* No. 05–92–01472–CV, slip op. at 15. The trial court erred in awarding prejudgment interest to be compounded annually. Pursuant to *Cavnar,* prejudgment interest to be compounded daily should have been awarded. Summit and Dunnam–Snyder's third cross-point of error is sustained. We overrule Campbell Taggart and Anheuser–Busch's eighteenth point of error.

## DISPOSITION

We reverse that part of the trial court's judgment rendered in favor of Dunnam–

Snyder, and we render judgment that Dunnam–Snyder take nothing. We modify the award of prejudgment interest to Summit to the extent that it provided for compounding annually. Consistent with this opinion, we modify the trial court's award of prejudgment interest to provide for compounding daily. In all other respects, we affirm that part of the judgment rendered in favor of Summit.[12] Further, we render judgment that Summit breached the covenant not to compete as a matter of law, and we remand this cause to the trial court solely for (1) recomputation of the prejudgment interest award in accordance with this opinion, (2) adjudication of any issues concerning Summit's affirmative defenses to the breach of the covenant not to compete, and (3) resolution of the question of entitlement to damages and any attorney's fees in connection with the claim that Summit breached the covenant not to compete. *See* Tex.R.App.P. 81(b)(1), (c).

---

12. We do not reach Summit's first cross point of error as it was conditioned upon reversal of the award in favor of it.