IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-10882
_____

PEGGY MASTERSON STINNETT; PEGGY MASTERSON STINNETT, Trustee
of the R.B. Masterson Trusts; The Bennett Masterson Trust #1
and the Ben Masterson Stinnett Trust; LAUREL S. EMMETT;
SIDNEY S. BOYCE; MARY KRITSER MILLER; GEORGE SHELBY MILLER;
JOHN SIEBERT MILLER; MARTHA MILLER JARNAGIN; ELIZABETH K.
MASTERSON, Co-Trustee of the R. B. Masterson III Trust;
WILLIAM A. MASTERSON, Co-Trustee of the R. B. Masterson III
Trust; MARY LEWIS KLEBERG, Trustee of the Mary Lewis Kleberg
Trust; NATIONSBANK CORPORATION, Trustee of the T. B. Masterson
Jr. Trust; FIRST NATIONAL BANK OF AMARILLO, Trustee of the
Anna Belle Kritser Testamentary Trust; Trustee of the David
Sloan Kritser Trust; Trustee of the Shelby Masterson Kritser
Trust; Trustee of the Tom Moylan Kritser Trust; and Trustee
of the Mary Kritser Miller Trust; AMARILLO NATIONAL BANK,
Joint-Trustee of the Michael Weymouth Campbell Life Income
Trust; MARY ANN MUSICK, Joint-Trustee of the Michael
Weymouth Campbell Life Income Trust; ANN CAMPBELL MUSICK,
Custodian for Sarah Elizabeth Campbell; MICHAEL CAMPBELL,
Custodian for Sarah Elizabeth Campbell; TEXAS COMMERCE
BANK-AUSTIN, NA, Trustee of the Zachary T. Scott, Jr. Trust
No. 1 U/A dated November 1, 1941; The Zachary T. Scott,
Jr. Trust No. 2 U/A dated January 17, 1944; The Zachary T.
Scott, Jr. Trust No. 3 U/A dated December 16, 1952; The Ann
Scott Hearon Trust No. 1 U/A dated November 1, 1941; The Ann
Scott Hearon Trust No. 2 U/A dated January 17, 1944; and The
Ann Scott Hearon Trust No. 3 U/A dated December 16, 1952;
GEORGE C. MILLER, Executor of the Mary Kritser Miller Estate;
AMARILLO NATIONAL BANK, Trustee of the Susan Weymouth Snyder
Trust; The Betsy Bradshaw Life Income Trust; The Edmond L.
Bradshaw Revocable Trust; The Mary Ann Campbell Musick
Trust; The Thomas C. Campbell Revocable Trust; The Thomas C.
Campbell Children's Trust f/b/o Karly Nicole Campbell; The
Thomas C. Campbell Trust f/b/o Skyler Elise Campbell; The
Shannon Kay Parr Revocable Trust; The Michael W. Campbell II
Trust; The M. W. Campbell Children's Bond Trust; The Michael
Weymouth Campbell Children's Trust f/b/o Michael Weymouth
Campbell, III and Sarah Elizabeth Campbell; The Thomas Betsy
Jane Campbell Lien Trust; and the Betsy Campbell Lien Trust;

Plaintiffs-Appellants-Cross-Appellees,

versus

COLORADO INTERSTATE GAS COMPANY,

                       Defendant-Third Party Plaintiff-
                       Appellee-Cross Appellant,

versus

MESA OPERATING LIMITED PARTNERSHIP,

           Third Party Defendant-Appellee-Cross-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Texas, Amarillo
_____
September 8, 2000

BEFORE DAVIS, SMITH, and WIENER, Circuit Judges

WIENER, Circuit Judge.

Grounded in mineral exploration, development, and production in the panhandle of Texas with a history almost as long as that State's oil and gas industry itself, the case that engenders the instant appeal requires interpretation of contractual provisions contained in several agreements and application of such interpretation to facts that are either undisputed or have been determined by a jury. The plaintiffs (collectively, "the Mastersons"), as lessors and successors in interest to lessors of minerals in the West Panhandle Field (the "Field"), instigated this litigation in district court on the jurisdictional basis of diversity citizenship, asserting damage claims for and related to underpayment of lease royalties. The action was brought in 1992 against Colorado Interstate Gas Company ("CIG") which in turn

2

impleaded Mesa Operating Limited Partnership ("Mesa"), the operator of the Field.[1]

The long —— and frequently rancorous and litigious —— contractual history of the oil and gas interests that lie at the center of this controversy was consolidated and restated in 1955 in a new and comprehensive mineral lease (the "1955 Lease") from the Mastersons as lessors to CIG as lessee. Over the ensuing decades the parties entered into various supplemental and related agreements and engaged in litigation of which the instant action is but the latest chapter. After the district court dismissed some of the Mastersons' claims and a lengthy trial resulted in the jury's determination that the Texas theory of quasi-estoppel barred recovery of all but a modicum of the multi-million dollar amount sued for, the court entered a take-nothing judgment in favor of CIG. This appeal ensued.

## I.

### Facts and Proceedings

Within a few years after execution of the 1955 Lease new controversies arose, culminating in a settlement agreement (the "1967 Settlement"). A key provision of that contract, and one that

---

[1] Even though many of the parties to the instant litigation are relative newcomers to the multi-decade leasing and production history of the West Panhandle Field, we refer to the historical lessors and their successors as the Mastersons and the historical lessees as CIG, despite the fact that some of the information that serves as background to the instant controversy involves predecessors in interest on both sides of the lawsuit.

is central to this case, is a "favored nation clause" ("FNC") which was engrafted on the basic market value pricing scheme of the 1955 Lease. The FNC is contained in the third of four subsections of Section A(2) of the 1967 Settlement: Subsection (a) fixes the royalty rate of the 1955 Lease at 1/8th of 14¢ per mcf[2] of gas produced between July 1, 1967 and December 31, 1969; subsection (b) fixes the royalty rate at 1/8th of the higher of 14¢ per mcf or market value of the gas at the wellhead produced from January 1, 1970 through the remainder of the 1955 Lease term; subsection (c) spells out the FNC; and subsection (d), which addresses maximum royalty rates in the event of Federal Power Commission ("FPC") gas price regulation, is acknowledged by the parties to be irrelevant to this litigation. In its entirety, subsection A(2)(c), the FNC, states:

> In the event that [CIG] should, at any time after July 1, 1967, voluntarily pay to any of its lessors in the West Panhandle Field royalty for gas produced from the West Panhandle and Red Cave Formations at a rate based on a price per Mcf higher than that price upon which royalties are then being computed and paid to Masterson hereunder, [CIG] agrees to pay to Masterson royalties at the rate of one-eighth (1/8) of such higher price from and after such time through the remainder of the lease.

None appear to dispute that the 1967 Settlement in general and the FNC in particular constituted the agreed disposition of the Mastersons' complaints about past disparities in payment of

---

[2] Thousand cubic feet.

royalties, particularly in comparison to royalties paid to other significant lessors in the Field (collectively the "Bivenses"). Likewise undisputed is the overarching premise that, to function as intended, the FNC had to operate in a single-price universe, in which the Mastersons' royalties would be calculated on the basis of the highest gas price used for calculation of the Bivenses' royalty.

The FNC worked as intended until the Federal Power Commission ("FPC") introduced price controls that established a multi-level price scheme, keyed to the age of the well from which the gas in question was produced. This change led the Mastersons and CIG to modify their arrangement by executing another contract (the "1974 Agreement") which created a tiered royalty calculation procedure. Pertinent to this case is the provision in the 1974 Agreement that payments made to the Mastersons under the 1955 Lease as modified by the 1967 Settlement would be "in lieu of any and all other royalties or payments to which [the Mastersons] might otherwise be entitled." The 1974 Agreement also specified that payment of royalties to the Bivenses based on the same terms as those contained in the 1974 Agreement would not trigger the FNC. The thrust of this provision was to allow CIG to make the same pricing "deal" with other lessors in the Field as made with the Mastersons in the 1974 Agreement.

Matters became even more complex when, in 1978, the Federal Energy Regulatory Commission ("FERC") was created and empowered to

5

set maximum rates or "caps" on multiple categories of natural gas. In response to this development, CIG entered into pricing modifications with the Bivenses, then offered the same "deal" to the Mastersons. Because this arrangement specified, among other things, that eventually royalties would be calculated on the last regulated rate preceding any eventual deregulation, the Mastersons rejected it, preferring an arrangement following deregulation that would require royalties to be calculated on the basis of the market value of the gas.

Despite rejecting the same deal that CIG had consummated with the Bivenses, the Mastersons nevertheless asserted claims under the FNC based on one provision — the so-called City Rate for gas sold to Amarillo — that was being used to calculate royalties paid to other lessors under the very arrangement that the Mastersons had rejected. In 1988, these claims led to yet another pair of modifying contracts, the Lease Amendment Agreement (the "1988 Amendment") and the 1988 Royalty Agreement (collectively, the "1988 Agreements"), effective October 1, 1988. By virtue of these revisions, the Mastersons both achieved the increased royalties and the City Rate and retained their right to claim royalties calculated on the basis of market value rather than the last FERC rate following deregulation.

The incentive for CIG to (1) increase the Mastersons' royalty on so-called old gas, (2) pay the City Rate, and (3) permit the Mastersons to retain the right to be paid royalties calculated on

6

the basis of market value pricing following deregulation, was the release provision set forth in paragraph 9 of the 1988 Amendment, in which the Mastersons agreed to release CIG and Mesa from all claims, whether known or unknown, disclosed or undisclosed, related directly or indirectly to gas produced under the 1955 Lease prior to 1989. Regarding royalty payments related to gas produced under the 1955 Lease after 1988, the parties agreed, in paragraph 7 of the 1988 Amendment and paragraph 1(b) of the 1988 Royalty Agreement, that all such payments would be "in lieu of any other rate" and would "fully satisfy and comply with the provisions of" the 1955 Lease and all intervening revisions and modifications.

Before trial, the district court granted a partial summary judgment in favor of the Mastersons, holding the FNC valid; and, on the eve of trial, the court granted a partial summary judgment in favor of CIG, dismissing the Mastersons' fraud and breach of fiduciary duty claims and denying their "discovery rule" exceptions to CIG's release and statute of limitation defenses.

A considerable portion of the testimony and documentary evidence presented to the jury during the trial addressed the machinations of the parties and their representatives that transpired between the effective date of the 1988 Agreements (or possibly even prior to that date) and the date in 1992 when the instant lawsuit was filed. That evidence centers primarily on (1) the positions taken by the parties and their representatives vis-a-vis one another, (2) the appropriate gas price or prices to be used

7

in the calculation of royalties, (3) the theories and bases of the claims, and (4) matters disclosed and not disclosed in allegedly disingenuous communications between and among those who were purported to be secretly scheming and plotting claims and defenses to claims. Rather than recounting all the details, it suffices for the moment that the jury ultimately credited the version of these actions and communications that led to its finding of quasi-estoppel against the Mastersons on their post-1988 claims.

## II.

## Analysis

### A. Fraud and Breach of Fiduciary Duty

As the district court dismissed the Mastersons' claims of fraud and breach of fiduciary duty, we address them first. In making its rulings on these issues, the district court did so as a matter of law, grounding its decisions in material facts that are not in dispute. Our review is therefore plenary.

### 1. Fraud

In setting the stage for its ruling on the Mastersons' fraud claim, the district court correctly noted the elements of such a claim in Texas: (1) A material representation was made (2) that was false when made (3) by a speaker who either knew the statement was false or made it as a positive assertion recklessly and without knowledge of its truth (4) with the intent that the statement be acted on, and (5) the party opposite acted in reliance on the false material representation and (6) was injured as a result of doing

8

so.[3]  The foundation of the Mastersons' claim of fraud is the omission from CIG's monthly royalty statements of any information about the rates CIG was using to calculate the royalties it was paying to the Bivenses.  As such, the Mastersons' fraud allegations rest entirely on CIG's silence; CIG is not accused of making any affirmative misrepresentation regarding the rates used to figure the royalties being paid to the Bivenses.

We have long recognized that Texas's law of fraud does not impose liability for silence except when the one who has remained silent is under a special duty to speak.[4]  In recognition of this requirement when a claim of fraud is based on failure to speak, the Mastersons advance the theory that the FNC produced a fiduciary relationship between themselves and CIG, which relationship is sufficient to meet the special duty requirement of fraud through silence.

2.  Fiduciary Relationship

The district court concluded that the Mastersons' contention that the FNC embodies a fiduciary duty requiring CIG to divulge with each royalty statement the additional information about the rate of royalty being paid to the Bivenses finds no support in the applicable case law.  We agree.  In Texas, a "fiduciary

---

[3]  See, e.g., Eagle Properties, Ltd. v. Sharbauer, 807 S.W.2d 714, 723 (Tex. 1990).

[4]  See Hickok Prod. & Dev. Co. v. Texas Co., 128 F.2d 183, 185 (5th Cir. 1942).

9

relationship is an extraordinary one and will not be lightly created."[5]  Fiduciary duties do not abound in every, or even most, garden variety, arms-length contractual relationships, even those among trusting friends.[6]

More specifically, favored nation clauses are anything but rara avis in the Texas oilpatch; and there is a plethora of opinions implicating Texas mineral contracts to be found in the pages of the South Western Reporter and the Federal Reporter.  Yet in our independent research we have failed to locate any cases holding that a favored nation clause in a contract between an oil and gas lessor and its lessee produces a fiduciary relationship; and the Mastersons have cited us to none.  In attempting to do so, however, they have referred us to cases which they advance as holding that a variety of contractual relationships gives rise to fiduciary duties.  Their reliance on these cases is unavailing. Manges v. Guerra,[7] for example, eschews a rule of contract-based fiduciary duty, holding instead that such a duty "arises from the relationship and not from express or implied terms of the contract

---

[5]  Castillo v. First City BancCorp. of Texas, 43 F.3d 953, 957 (5th Cir. 1994) (quoting Tel-Phonic Servs., Inc. v TBS Int'l, Inc., 975 F.2d 1134, 1143 (5th Cir. 1992).

[6]  See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 594-95 (Tex. 1992).

[7]  673 S.W.2d 180 (Tex. 1984).

or deed."[8]  As mineral lessors and lessee, the Mastersons and CIG are not in a fiduciary relationship.[9]  In actuality, the facts of the cases relied on by the Mastersons to support the proposition that a mineral lessee is in a fiduciary relationship with his lessor are so distinguishable from the instant facts as to be inapposite.[10]  Our de novo review of the district court's dismissal of the Mastersons' claims grounded in fraud and fiduciary duty satisfies us that the court was correct, and we affirm.

B.    The Mastersons' Pre-1989 Claims

1.    Release Clause:  1988 Amendment.

---

[8]  Id. at 183; see also Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 177 (Tex. 1997) (tightly restricting holding of Manges while stating that "a holder of executive rights to a mineral estate owes a fiduciary duty to the non-executive interest")

[9]  See HECI Exploration Co. v. Neel, 982 S.W.2d 881, 884 (Tex. 1998) ("Texas law has never recognized a fiduciary relationship between a lessee and royalty owners."); Mitchell Energy Corp. v. Sampson Resources Co., 80 F.3d 976, 985 (5th Cir. 1996)(applying Texas law); Hurd Enters., Ltd. v. Bruni, 828 S.W.2d 101, 112 (Tex. App.-San Antonio 1992, writ denied); Cambridge Oil Co. v. Huggins, 765 S.W.2d 540, 544-45 (Tex. App.-Corpus Christi 1989, writ denied).

[10]  Sanus/New York Life Health Plan v. Dube-Seybold-Sutherland Management, Inc., 837 S.W.2d 191, 199 (Tex. App.-Houston [1st Dist.] 1992) (holding HMO had fiduciary obligations in its treatment of member physician partnership which was "totally dependent on [certain patient] information and relied exclusively on [HMO] to provide it"); LeCuno Oil Co. v. Smith, 306 S.W 2d 190, 192 (Tex. Civ. App.-Texarkana 1957, writ ref'd n.r.e.) (concerning a relationship "distinguishable from that found in most cases of this kind," in that lessee was both gas producer and pipeline operator, enabling it to "contract[] with itself respecting prices of gas at the wellhead.").

11

The Mastersons' damage claims for underpayment of royalties and related matters both before and after 1989, and CIG's contentions in opposition to claims for both periods, require interpretation of the several contracts implicated by those claims and defenses. Initially, therefore, we must determine whether the 1955 Lease and subsequent amendments and contracts affecting it are ambiguous or unambiguous, as our standard of review depends on the answer to that threshold question: Interpretation of ambiguous contracts implicates questions of fact,[11] which we review for clear error; interpretation of unambiguous contracts presents questions of law,[12] which we review de novo. Whether a contract is or is not ambiguous, however, is a question of law,[13] which we review de novo.

A contract is ambiguous only if its meaning is susceptible of multiple interpretations when subjected to applicable rules of contract construction and interpretation.[14] The mere fact that lawyers may disagree on the meaning of a contractual provision is not enough to constitute ambiguity.[15]

---

[11] See In re: Fender, 12 F.3d 480, 485 (5th Cir. 1995).

[12] See REO Indus., Inc. v. Natural Gas Pipeline of America, 932 F.2d 447, 453 (5th Cir. 1991).

[13] Reilly v. Rangers Management, Inc., 727 S.W.2d 527, 529 ( Tex. 1987).

[14] See Exxon Corp. v. West. Tex. Gathering Co., 868 S.W.2d 299, 302 (Tex. 1993); Nguyen Ngoc Giao v. Smith & Lamm, P.C., 714 S.W.2d 144, 147 (Tex. App.-Houston [1st Dist.] 1986).

[15] See D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am., 957 F.2d 196, 199 (5th Cir. 1992).

12

The district court performed the correct analysis on the pertinent portions of the 1967 Settlement as well as subsequent amendments and agreements relative to the 1955 Lease and concluded that all provisions of those modifying contracts implicated in this case are <u>un</u>ambiguous. For essentially the same reasons, we agree and therefore proceed to construe those contracts and their pertinent provisions <u>de novo</u>.[16] This in turn obligates us to give effect to the clear written expression of the intent of the parties.[17]

Although the FNC provision which first appeared in the 1967 Settlement lies at the heart of the Mastersons' claims, both before 1989 and following 1988, we bifurcate consideration of their claims because different legal and factual considerations apply, depending on which of those time periods is involved. The FNC as contained in section A(2)(c) of the 1967 Settlement specifies that if at any time CIG voluntarily pays to any of its major lessors in the Field royalties calculated on the basis of a higher rate than the rate on which the Mastersons' are being figured, CIG must pay the Mastersons' C royalty based on such higher rate, from that time through the remainder of the lease. The Mastersons' claims based on CIG's alleged violation of the FNC date from 1975 and thus

---

[16] <u>See</u> <u>Temple-Inland Forest Prods. Corp. v. United States</u>, 988 F.2d 1418, 1421 (5th Cir. 1993).

[17] <u>Ideal Lease Serv., Inc. v. Amoco Prod. Co.</u>, 662 S.W.2d 951, 953 (Tex. 1983).

13

implicate the periods 1975 through 1988, and 1989 and following. The reason for our bifurcation will become evident when we test the efficacy of the release provision of the 1988 Amendment's Paragraph 9 (the "Release"), which states:

> Lessors do hereby release and forever discharge Lessee from all causes of actions, claims and demands, known or unknown, of whatever type, which Lessor has ever had, now have or may have hereafter arising out of, incident to, or directly or indirectly connected with gas produced to the [1955] Lease prior to October 1, 1988 and from October 1, 1988 to 1989, except as those royalties are to be paid as provided herein.

Pretermitting consideration at this juncture of the years 1989 and following, we turn to the language of the Release to see if it bars the Mastersons' FNC claims for the period 1975 through 1988. The Mastersons do not appear to dispute the absence of ambiguity in the Release or even CIG's interpretation of its wording, only its legal effects. Their contention is that Texas law requires such releases to be specific and that the Release is not sufficiently specific to exonerate CIG from pre-1989 liability under the FNC. The Mastersons rely primarily on Victoria Bank & Trust Co. v. Brady,[18] in response to which CIG relies primarily on the standard of specificity announced more recently in Memorial Med. Ctr. of East Texas v. Keszler.[19]  The district court agreed with CIG's

---

[18]  811 S.W.2d 931 (Tex. 1991).

[19]  943 S.W.2d 433 (Tex. 1997).  In a post-argument letter furnished by CIG pursuant to Federal Rule of Appellate Procedure 28(j), we are referred to the recent Texas Supreme Court case of

14

position which, because it presents a question of law, we review <u>de novo</u>.

Both <u>Victoria Bank</u> and <u>Memorial Medical Center</u> recognize that to be legally enforceable a release must "mention" the claim or claims being released.[20] We are satisfied that "mentioning" does not require particularized enumeration or detailed description, only that the claim being released come within the express contemplation of the release provision when viewed in context of the contract in which the release provision is contained, here the 1988 Amendment.[21] We conclude, as did the district court, that this standard is met by the Release vis-à-vis the pre-1989 claims asserted by the Mastersons.

The 1988 Amendment is concerned with the calculation of royalties under the 1955 Lease as modified in 1967 and 1974. The Release, embedded as it is in paragraph 9 of the 1988 Amendment, addresses "all causes of action" arising out of "gas produced

---

<u>Keck, Mahin & Cate v. National Union Fire Ins. Co. of Pittsburgh</u>, 20 S.W.3d 692, 698 (Tex. 2000) ("Nothing in <u>Brady</u> forbids such a broad-form release. <u>Brady</u> simply holds that the release must 'mention' the claim to be effective. It does not require that the parties anticipate and identify each potential cause of action relating to the release's subject matter. Although releases often consider claims existing at the time of execution, a valid release may encompass unknown claims and damages that develop in the future.") (internal citations omitted).

[20] <u>Memorial Medical Center</u>, 943 S.W.2d at 434; <u>Victoria Bank & Trust Co.</u>, 811 S.W.2d at 938.

[21] <u>Memorial Medical Center</u>, 943 S.W.2d at 435; <u>Victoria Bank & Trust Co.</u>, 811 S.W.2d at 938-39; <u>Keck, Mahin & Cate</u>, 20 S.W.3d at 698.

15

pursuant to the [1955] Lease." Surely the accusation that CIG failed to comply with its FNC obligations presents a cause of action that arises out of gas produced pursuant to the 1955 Lease, and is thus covered by the Release.

We likewise find unavailing the Mastersons' argument that the 1988 Amendment was so narrowly tailored as to cover only two very specific items, FERC Order 4051 and the City Rate. Even though most of the provisions of the 1988 Agreements address those two matters, read in full context those contracts address the entire relationship between the parties. In addition, the plain language of the Release itself reflects the clear intention of the parties that its coverage be broader than just the FERC Order and the City Rate, i.e., that it apply to claims arising from or connected with other provisions of predecessor contracts of which the FNC is one, irrespective of the primary focus of the 1988 Amendment of which the Release is a part. The Mastersons' contentions to the contrary notwithstanding, Texas law does not proscribe enforcement of such generally-worded release provisions as long as they can be fairly read as "mentioning" the kinds or classes of claims intended to be covered.[22]

In addition to their insistence that (1) the Release is not sufficiently specific to block their claims for CIG's purported violations of the FNC, and (2) the Release should be applied only

---

[22] See Mem. Med. Ctr. of East Texas, 943 S.W.2d at 434-35; Keck, Mahin & Cate, 20 S.W.2d at 697-98.

16

to the FERC Order and the City Rate, the Mastersons also advance fraud as a ground to avoid enforcement of the Release. They insist that CIG knew full well it had violated the 1955 Lease, as modified, when it negotiated and entered into the 1988 contract that contains the Release. The thrust of this argument is that CIG's silence in the face of such knowledge was a fraudulent attempt to avoid liability under the FNC. Our foregoing analysis of the Mastersons' claim of fraud through failure to divulge (silence), as distinct from affirmatively uttering a false statement, is applicable here; but their fraud assertion regarding the Release fails for another, independent reason as well. The Release expressly applies to "all causes of action," including those that at the time were "disclosed or undisclosed." The plain language of the Release demonstrates that, in exchange for the benefits and concessions granted to the Mastersons, CIG bargained for and received an express release from those past violations that were undisclosed as well as any that were disclosed. This negates the contention that CIG was under any obligation, whether from provisions of the 1988 Amendment or Texas law, to list or otherwise disclose prior lease violations, if any. The record confirms that the Mastersons —— themselves anything but "widows and orphans" —— and their sophisticated legal and financial advisors were well aware, before signing on, that the Release would —— in their own colorful vernacular —— "wash all [of CIG's] sins away."

The Mastersons have cited us to no authority holding that bargaining for such a release is fraudulent. Like the district court before us, we are convinced that, as a matter of law, the Release bars the Mastersons from prosecuting claims for violations assertedly occurring from 1975 through and including 1988.[23]

2. Claims for 1989 and Following

a. "In lieu of" defense

One affirmative defense asserted by CIG in preclusion of recovery by the Mastersons is founded on the Texas doctrine of quasi-estoppel. This defense was credited by the jury and, at least by implication, by the district court. Before reaching quasi-estoppel, however, we are constrained to address CIG's contractual contention that enforcement of the Mastersons' post-1988 claims is precluded by a fair reading of pertinent portions of the subject agreements. The contract provision to which CIG invites our attention is the "in lieu of" provision in the 1988 Amendment.[24] Paragraph 7 of that contract states:

---

[23] The district court also found the Mastersons' pre-1989 claims barred by the statute of limitations. As we conclude de novo that the Release bars such recovery, we need not address the statute of limitations. Having familiarized ourselves with the relevant facts, the legal arguments advanced by the parties in their briefs, and the reasoning of the district court, however, we note in passing that the district court appears to have "gotten it right" on time bar as well.

[24] CIG also advanced an "in lieu of" provision contained in the 1974 Agreement. Having concluded that the Release effectively absolves CIG from claims of violating its obligations under the 1955 Lease occurring prior to 1989, however, it is not necessary for us to focus on the "in lieu of" provision of the 1974

18

> Lessors agree that all royalty payments made pursuant to this Agreement are in lieu of any other rate, reimbursement or method of measurement and shall constitute and be deemed full payment by Lessee for all gas, including casing head gas, produced pursuant to the Lease and shall fully satisfy and comply with the provisions of the [1955] Lease as amended herein. <u>Except as stated in this Agreement, the Lease is not otherwise amended.</u>(emphasis added).

As a foundation for its argument that payments made pursuant to the specific provisions of the 1988 Agreements fully satisfy and comply with the provisions of the 1955 Lease as amended, CIG attempts to distinguish the "Agreement" referred to in Paragraph 7 (the 1988 Amendment) from the "Lease" referred to in that paragraph (the 1955 Lease). From that starting point, CIG contends that the portions of the 1955 Lease that were not expressly restated in the 1988 Agreements —— specifically, the FNC as incorporated by reference into the 1955 Lease by the 1967 Settlement —— are of no force or effect after 1988. This creative but unsupported interpretation is fatally flawed for several reasons. First, we need not go beyond the plain wording of the provisions of the 1988 Amendment which proclaim that "[e]xcept as stated in this [Amendment] Agreement, the [1955] Lease is not otherwise amended." This declaration states the diametric opposite of CIG's proffered interpretation which would posit that any provision of the 1955

_____

Agreement, even though the similarity in wording of the 1974 and 1988 provisions would make our analysis generally applicable to that provision in the earlier agreement, and thus to the pre-1989 claims, were they not barred by the Release.

19

Lease that is not reiterated in this 1988 Amendment is no longer in force or effect. That might well be a fair provision in a document purporting to be a total restatement or republication of an earlier agreement but not in an errata-type amendment like the 1988 Amendment. Absent an express statement to that effect, no accepted canons of contractual interpretation would support such a reading.[25] To accept CIG's reading of the 1988 Amendment as broadly repealing all provisions of the 1955 Lease other than those expressly reiterated in the 1988 Amendment also runs contrary to the express declaration of the latter.

More to the point, when the 1988 Amendment is construed as a whole, it becomes clear that Paragraph 7's "in lieu of" provision does not render the FNC nugatory or, in CIG's terms, "fulfilled." Specifically, CIG argues that, because Paragraph 7 specifies that "all royalty payments made pursuant to this [1988] Agreement are in lieu of any other rate...," all royalty payment obligations of Section A(2) of the 1967 Settlement are satisfied by payments to the Mastersons pursuant to Paragraph 3 of the 1988 Amendment. The flaw in this logic lies in the language of paragraph 3 of the 1988 Amendment that states unambiguously that "[t]he provisions of paragraphs A(2)(a) and (b)" of the 1967 Settlement are the ones replaced by paragraph 3. As paragraph 2 of the 1988 Amendment

_____

[25] See Reilly v. Rangers Management, Inc., 727 S.W.2d 527, 529 (Tex. 1987) (a contract and its subsequent modifications must be considered as a whole).

20

makes pellucid, paragraph 3 replaces only the two denominated sub-paragraphs of Paragraph A(2) of the 1967 Settlement, i.e., A(2)(a) and A(2)(b); clearly nothing in the 1988 Agreements repeals or otherwise affects or supplants subparagraph A(2)(<u>c</u>) of the 1967 Settlement, which, as we know, is the FNC.

When we hark back to the declaration in the 1988 Amendment to the effect that "[e]xcept as stated in [the 1988] Amendment, the [1955] Lease is not otherwise amended," no doubt can remain that payments made "pursuant to" the 1988 Agreements must comply with the provisions of the FNC. Inasmuch as (1) the 1988 Amendment declares the continued efficacy of all provisions of, <u>inter</u> <u>alia</u>, the 1967 Settlement that are not expressly repealed, substituted, or modified by provisions of the 1988 Agreements, and (2) subparagraph A(2)(c), the FNC provision, is <u>not</u> expressly supplanted, payments made in conformity to those contracts must conform to the FNC as well.

We agree with the Mastersons and the district court that the "in lieu of" provisions of Paragraph 7 of the 1988 Amendment do not shield CIG from the Mastersons' post-1988 FNC claims. That leaves quasi-estoppel as CIG's last bastion.

b.   Quasi-estoppel

With the Mastersons' post-1988 claims being free from the strictures of time bar and from the assertion by CIG, which we have rejected, that those claims are precluded by the "in lieu of" provisions of Paragraph 7 of the 1988 Amendment, CIG as appellee

21

can sustain the finding of the jury and judgment of the district court only by prevailing under the Texas doctrine of quasi-estoppel.  A generally accepted verbalization of that doctrine states:

> [The principle of] quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken.  The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.[26]

Despite its awarding of a relatively nominal recovery to the Mastersons, the jury found that they are quasi-estopped from asserting the multimillion dollar claim that is the principal thrust of this litigation.  Quasi-estoppel is a factual determination and thus the province of the jury, which we review by testing the sufficiency of the evidence.  When we do so, we will reverse only if no reasonable jury could have arrived at the

---

[26] Lopez v. Muñoz, Hockema & Reed, L.L.P. et al, 22 S.W.3d 857, 864 (Tex. 2000) (quoting Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 240 (Tex. App.-Corpus Christi 1994, writ denied) (citations omitted). See also Bristol-Meyers Squibb Co. v. Barner, 964 S.W.2d 299, 302 (Tex. App.-Corpus Christi 1998) ("Misrepresentation by one party, and reliance by the other, are not necessary elements of quasi-estoppel.") (citations omitted); Vessels v. Anschutz Corp., 823 S.W.2d 762, 765-66 (Tex. App.-Texarkana 1992, writ denied).  Contrary to the Mastersons' assertion, the Texas Supreme Court's opinion in Trevino v. Turcotte, 564 S.W.2d 682, 687 (Tex. 1978) has not added the additional element of "full requisite knowledge" of the facts and law to the definition of quasi-estoppel.  But, even if Trevino did stand for that proposition, which it does not, the Mastersons' assertion that they lacked such knowledge is refuted by the record.

22

verdict, considering "all the evidence...in the light and with all reasonable inferences most favorable to the party" in whose favor the verdict was rendered.[27]

A review of the evidence presented to the jury in this case does not produce an overwhelming weight either favoring or rejecting a factual basis for quasi-estoppel. Thus the evidence does not support an indisputable factual conclusion either way. It follows, therefore, that reasonable jurors and reasonable juries could differ, thus precluding a conclusion on appellate review that no reasonable jury could have found quasi-estoppel.

The record reflects that the parties operated under a so-called "deal-for-deal" interpretation of the FNC for several of the years in question. After sending monthly market price letters to CIG in a now-apparent effort to imply continued reliance on the proffered theory of their claims, the Mastersons precipitously asserted claims against CIG based on a "weighted average price" ("WAP") interpretation of the FNC, a 180-degree change of position by the Mastersons. Under their WAP interpretation, CIG would owe them in excess of $61 million, clearly a change of position detrimental to CIG. Significantly, the Mastersons even stipulated that they would not be entitled to damages under a "deal-for-deal" interpretation of the FNC.

---

[27] Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), overruled on other grounds by Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997) (en banc).

Our review of the jury's finding of quasi-estoppel next leads us to inquire whether the evidence was sufficient to support a determination that the prior deal-for-deal position had produced an advantage for the Mastersons. The record reflects that the Mastersons intended and were able to use the FNC beneficially as a "bargaining chip" or "tool" for leverage in dealings with CIG, and that they received royalty price increases and preferable pricing terms by pressing the deal-for-deal interpretation. A reasonable jury could find, as this one did, that the Mastersons benefitted from their previously maintained position.

We turn finally to the question whether a reasonable jury could conclude that the Mastersons' change of position was unconscionable. The Mastersons have not assigned error to the district court's defining "unconscionable" as grossly unfair or unjust. They have, however, attempted to characterize CIG's argument of unconscionability as merely quarreling with the size of the Mastersons' claim. We perceive this to be an inaccurate smoke screening by the Mastersons to obfuscate the proper characterization of CIG's argument: The breaches the Mastersons now assert could have been avoided had CIG not relied on and acted in response to the Mastersons' original deal-for-deal position as maintained over a considerable period of time. Even though reliance is not an element per se of quasi-estoppel, the Mastersons' allegation that CIG continuously breached the WAP

24

interpretation of the FNC, assertedly accumulating millions of dollars in damages, was the product of its conforming to the deal-for-deal interpretation as mutually understood by the parties. This is relevant:  When the correct analysis of the facts is applied to another viable interpretation, i.e., that the Mastersons stood mute despite their knowledge that CIG's actions were — in the Mastersons' opinion — forming the basis of a multimillion dollar claim against CIG that the Mastersons were confecting, we cannot charge this jury with making a finding that no reasonable jury could have made, i.e., that the Mastersons are unconscionable in asserting their present claims on the basis of WAP after cynically misleading CIG with the deal-for-deal theory for FNC determination.  We find no reversible error in the jury's determination of quasi-estoppel, and therefore affirm.  A result of affirming that finding is to make moot the Mastersons' argument that the jury's award of $140,554.24 is not supported by the evidence.[28]

### III.

### Conclusion

---

[28]  We nevertheless note that the record contradicts the Mastersons' insistence that the jury was not free to disregard the "uncontradicted" testimony of the Mastersons' expert, relying on Webster v. Offshore Food Serv., Inc., 434 F.2d 1191, 1193 (5th Cir. 1970).  Our review of the record demonstrates that the testimony was disputed by impeachment on cross examination and by live testimony of the witnesses.

25

Given the protracted and contentious history of the relationship of the parties and their predecessors, we are not sanguine that our judgment today will produce an end to hostilities. That, however, is not our mission: As a court of error, we are charged only with determining whether the errors of fact and law asserted by appellants present valid reasons for reversing the results reached by the district court and the jury. For the reasons set forth above, we are convinced that affirmance, not reversal, is in order. The Mastersons' assertions of fraud and breach of fiduciary duty were properly dismissed by the district court for the reasons we have stated. Their claims for alleged breach of contract occurring prior to 1989 are barred by the Release they granted to CIG in the 1988 Amendment. The several amendments and contractual supplements to the 1955 Lease do not bar the Mastersons from asserting post-1988 breaches of the favored nation clause because it was not repealed or supplanted by the "in lieu of" provisions of Paragraph 7 of the 1988 Amendment: That agreement affected only subparagraphs A(2)(a) and A(2)(b) of the 1967 Settlement, and not A(2)(c) in which the FNC is contained. Nevertheless, the jury did not err reversibly in concluding as a matter of fact that the Mastersons are quasi-estopped from asserting and recovering on their post-1988 claims. Finally, the district court's take-nothing judgment against the Mastersons is appropriate, despite the jury's award of $140,554.24, given the

26

Mastersons' concession that they cannot recover on a deal-for-deal claim under the FNC, which was the basis of the jury's award of that sum.  Therefore, the judgment of the district court and all rulings implicated in this appeal are, in all respects AFFIRMED.